**UNITED STATES of America**

v.

**Harold P. KOENIG et al., Defendants.**

**No. 73 Crim. 554 (CHT).**

United States District Court,
S. D. New York.

Aug. 19, 1974.

Paul J. Curran, U. S. Atty., New York City, for plaintiff; John M. Walker, Jr., W. Cullen MacDonald, Rodney K. Vincent, S.E.C., New York City, of counsel.

Rogers & Wells, New York City, for defendant Koenig; Norman S. Ostrow, Francis H. Wright, New York City, of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendant Krantz; Jay Greenfield, Mark A. Belnick, New York City, of counsel.

Orans, Elsen & Polstein, New York City, for defendant Mulligan; Sheldon H. Elsen, Leslie A. Lupert, New York City, of counsel.

Jerome F. Matedero, Westbury, N. Y., for defendant Reeves.

OPINION

TENNEY, District Judge.

Defendants Harold P. Koenig, Byron S. Krantz, George V. R. Mulligan and Ernest Gene Reeves have been charged by the Government, in a multi-count indictment, with conspiracy to violate various sections of the Securities Laws, the Mail Fraud statute and a prior order of this Court and with substantive violations of those provisions. Defendants waived their right to a trial by jury and, with the consent of the Government, the case was tried to the Court. The action is now before the Court, at the close of the Government's case, on the motion of all four defendants for an order entering a judgment of acquittal pursuant to Fed.R.Crim.P. 29(a).

The Court, aware that the case presented serious questions of law as to the criminal responsibility of "outside" directors and attorneys under the Securities Laws and related criminal statutes, as well as complex factual issues, and being further cognizant of the time already expended and the expense incurred in the prosecution and defense of this case, adjourned the trial at the close of the Government's case to allow all parties to brief, and the Court to determine, the issues generated by the record. At this point in the case, after many months of pre-trial preparation and twelve weeks of actual trial, the Court is confronted with some 5,000 pages of testimony, many hundreds of voluminous exhibits and over 1,000 pages of legal and factual argument submitted by the Government and defendants.

After having carefully weighed and analyzed the evidence adduced at trial and the arguments submitted by all parties, the Court is convinced that the Government has failed to sustain its burden of proof with respect to all defendants and as to every count in the indictment and that it must, therefore, order that a judgment of acquittal as to all counts be entered in favor of defendants Koenig, Krantz, Mulligan and

Reeves. By way of introduction to the opinion that follows, the Court would note that the evidence adduced will not permit a reasonable mind to find beyond a reasonable doubt that, *inter alia*, the defendants possessed the requisite criminal intent with regard to either the conspiracy or substantive counts; that, indeed, any conspiracy existed at all; and that, with respect to all counts, any scheme to defraud existed or that any material facts were misrepresented or omitted.

With this introduction in mind, the Court will now direct itself to the indictment as amplified by the bills of particulars, the law applicable to the present motion and the charges in the indictment, the relevant events preceding those upon which the present charges are based, and discussion of the particular charges themselves.

## I. THE INDICTMENT [1] AS AMPLIFIED BY THE BILLS OF PARTICULARS

### A. THE CONSPIRACY COUNT

Count 1 of the indictment—the conspiracy count—alleges that all four defendants, together with co-conspirators Ecological Science Corporation ("ECO"), John Downs, Robert B. Carter, Ross Bohannon, Cesare De-Franceschini, Richard Grosh, Eugene Johnson, Edward J. Kahl and Earl Rader, between approximately January 1, 1971 and December 31, 1972, in this District and elsewhere, unlawfully, willfully and knowingly conspired [2] to violate the Securities Exchange Act of 1934,[3] the Rules and Regulations of the Securities and Exchange Commission ("SEC") issued thereunder,[4] and the criminal contempt [5] and mail fraud statutes [6] of the United States.

The indictment claims the conspiracy had two purposes: first, to maintain the defendant Harold P. Koenig as chief operating officer of ECO and, second, to defraud ECO's creditors, stockholders, the public and the SEC. It goes on to identify four separate objects of the conspiracy:

1. To use and employ, in connection with the purchase and sale of securities of ECO and its subsidiaries, and by use of the means and instrumentalities of interstate commerce and the mails, deceptive devices and contrivances in violation of the rules and regulations promulgated by the SEC under § 10(b) of the Securities Exchange Act of 1934.

2. To unlawfully, willfully and knowingly make and cause to be made false and misleading statements with respect to material facts, and omit to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in reports relating to ECO's financial condition and business operations required to be filed with the American Stock Exchange ("AMEX") and the SEC under §§ 12 and 13 of the 1934 Act.

3. To unlawfully, willfully and knowingly use the mails to deliver certain matter for the purpose of executing a scheme and artifice to defraud, and for obtaining money and property under false and fraudulent pretenses.

4. To unlawfully, willfully, knowingly and criminally disobey a lawful order of this Court namely, an order dated April 30, 1971 in the case of Securities and Exchange Commission v. Ecological Science Corporation and Harold P. Koenig, 71 Civ. 1928, by committing and carrying out the acts alleged in Counts 2 and 3 of the indictment. (Indictment,

---

1. The Court will not discuss in this opinion Count 17 of the indictment, which charged defendant Mulligan with perjury before the Grand Jury, since that count was dismissed in open court at the conclusion of the Government's case.

2. 18 U.S.C. § 371.

3. 15 U.S.C. §§ 78j(b), 78*l*, 78m, 78ff(a).

4. Rules 10b–5, 13a–11, and 13a–13 (17 C.F.R. §§ 240.10b–5, 240.13a–11, and 240.13a–13).

5. 18 U.S.C. §§ 401, 402.

6. 18 U.S.C. § 1341.

¶ 17 and Bill of Particulars, ¶¶ 16, 17 and 50).

The indictment then specifies certain activities of the defendants and their alleged co-conspirators as being some of the means by which the conspiracy was carried out (¶¶ 18(a) through (i)). Actually, these activities, as alleged, fall into four separate categories:[7]

First, that defendants Koenig, Mulligan and Krantz, in order to cause the SEC and the AMEX to discontinue their investigations into the activities of defendants and co-conspirators, consented to the entry of the court order referred to above, and that all four defendants, from on or about May 1, 1971 to on or about December 1972, willfully disregarded and violated that order. (Indictment, ¶¶ 18(a) and (i)).

Second, that beginning in and about June 1971, defendant Koenig and others planned, and then effected, a secret recapitalization of certain ECO European subsidiaries by transferring voting control and certain dividend rights from ECO and its shareholders to an Italian partnership dominated and controlled by Koenig, and that this action was taken to (1) prevent the shareholders and creditors of ECO from removing Koenig from office, and (2) remove valuable ECO assets from the reach of ECO's American creditors. Next, it is alleged that, from in and about June 1971 up to and including August 1971, defendants Koenig, Mulligan and Krantz, and others concealed the recapitalization plan from ECO's creditors and shareholders, the SEC, the AMEX, ECO directors Grinnell Morris and Norman Davidson and the public. Finally, it is asserted that all four defendants, as well as co-conspirators Kahl, Carter, ECO and others, concealed this recapitalization from ECO's shareholders and the public from in and about September 1971 through the end of December 1972. (Indictment, ¶ ¶ 18(b) through (e)).

The third group of conspiratorial acts alleged is that, from in or about June 1971 to on or about October 31, 1971, all four defendants and co-conspirators Bohannon, Downs, ECO and others, for the purpose of (1) deceiving ECO's creditors who were considering removing Koenig as chief operating officer of ECO and (2) deceiving ECO's shareholders into supporting Koenig, falsely represented that dealings between ECO and a corporate "shell" known as Southwest Nuclear, Inc. ("SWN") were the most noteworthy single event in ECO's recent history without disclosing that SWN was being promoted by defendant Mulligan and co-conspirator Bohannon and was a shell corporation without assets or employees. (Indictment, ¶ 18(f)).

The fourth focal point of the conspiracy deals with the allegations that, from in or about June 1971 up to and including December 1972, all four defendants and co-conspirators Downs, Bohannon, ECO and others issued false and fraudulent representations of the financial condition and business operations of ECO and its subsidiaries in press releases, letters to ECO shareholders and creditors and other statements, and that the same defendants, with co-conspirators Carter, Kahl, ECO and others, made similar false and fraudulent representations in reports filed with the SEC and AMEX from in and about September 1971 up to and including approximately December. 1972. (Indictment, ¶¶ 18(g) and (h)).

## B. THE SUBSTANTIVE COUNTS

### 1. *Securities Fraud*

Count 2 alleges that from approximately June 1, 1971 to approximately the end of 1972, all four defendants, co-conspirators ECO and others, in connection with the sale and purchase of ECO securities and by use of instrumentalities of interstate commerce and the mails, directly and indirectly, employed

---

7. The Government contends, however, that there was but one conspiracy and that all defendants were members of the conspiracy. (Bill of Particulars, ¶ 13).

a scheme to defraud the creditors and stockholders of ECO the AMEX and the public, and made false and misleading statements in connection with recapitalization of the European subsidiaries as alleged in ¶¶ 18(b) through (e) of Count 1 of the indictment.

Count 3 alleges a violation of the same statute and regulations as Count 2 (15 U.S.C. §§ 78j(b) and 78ff(a); 17 C.F.R. § 240.10b–5; 18 U.S.C. § 2) with respect to certain representations concerning SWN as set forth in ¶ 18(f) of Count 1.

### 2. *Reporting Violations*

Counts 4 through 16 deal with the individual reports filed with the SEC and the AMEX from September 17, 1971 up to and including the filing of the Second Quarter 1972 10–Q report on September 18, 1972. The principal defect found by the Government with respect to these filings is that the recapitalization of the European subsidiaries was inadequately described and, in particular, that they failed to properly disclose that voting control and a portion of the equity of ECO's European subsidiaries had been transferred from ECO to defendant Koenig and others, the reasons for such transfer, and the consequences thereof as they affected descriptions of ownership and control of the various subsidiaries.

In addition, the Government has attacked the filings for inadequately describing (1) the Southwest Nuclear project, (2) ECO's debt in litigation and (3) other failures to adequately disclose material information which will be discussed *infra* with respect to the individual counts.

### 3. *Mail Fraud Counts*

Counts 18 through 29 allege particular mailings made in furtherance of a scheme and artifice to defraud. Of these, Counts 18, 19, 20, 23, 26 and 29 remain in the case, the others having been dismissed on April 25, 1974. The

material mailed consisted of letters or reports which are also the subject of attack under other counts.

## II. THE STANDARD TO BE APPLIED ON A MOTION UNDER RULE 29 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

■ The standard to be applied in determining the sufficiency ˙of all the evidence on this motion is set forth in United States v. Taylor, 464 F.2d 240, 242–243 (2d Cir. 1972). The test is higher than that applied in a civil case and it is higher than a test of "clear and convincing evidence".

> "The true rule, therefore, is that a trial judge, in passing upon a motion for directed verdict of acquittal, must determine whether upon the evidence, giving full play to the right of the jury to . determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. If he concludes that upon the evidence .there must be such a doubt in a reasonable mind, he must grant the motion; or, to state it another way, if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt, the motion must be granted. If he concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, he must let the jury decide the matter." Curley v. United States, 81 U.S.App. D.C. 389, 160 F.2d 229, 232–233, cert. denied, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947), cited in United States v. Taylor, *supra*, 464 F.2d at 243.

This standard is applicable to Bench trials as well as trials by jury. United States v. Freeman, 498 F.2d 569 (2d Cir. 1974). Thus, the case must be dismissed at this point in the trial unless a reasonable mind might fairly conclude guilt beyond a reasonable doubt.

## III. PRELIMINARY STATEMENT

Ecological Science Corporation (a Florida corporation) is the successor to Southern Gulf Utilities, formed in 1958 by Norman J. Davidson (a former president of the Curtis-Wright Corporation) and William Siegal to operate water and sewage utilities for new home developments in that state. The original company enjoyed a modest growth until 1967 when it achieved approximately $4 million in revenues. Commencing in 1966 Davidson, who had other financial and real estate investments, looked for an executive officer to take over operation of the company and give Davidson an opportunity to relax, golf, and attend to his other investments. The search culminated in November 1967 with the selection of Harold P. Koenig, by the Board of Directors of Southern Gulf Utilities, as President, Chief Executive Officer and a member of the Executive Committee. Davidson in turn became Chairman of the Board and a member of the Executive Committee, and, despite his intention to become less actively involved, continued to participate in the management of the business.

There would not appear to be any question that Koenig, over those first years through 1969, increased the business and expanded the operations of the company which, in 1968, had changed its name to Ecological Science Corporation ("ECO"). The Executive Committee, consisting of Davidson and Koenig, received authority from the Board for acquisitions up to specified amounts without prior approval and both Koenig and Davidson subsequently effected acquisitions which did not receive Board approval until accomplished. Koenig, however, was not only a corporate builder; he was also a "salesman" and it was primarily this function that, in the latter part of 1969, started the dominoes tumbling.

This was a time when "ecology" was becoming a popular word and an attractive cause and Koenig carried on a public relations campaign to exploit to the fullest the expanding position of ECO in that field. As a result, the American Stock Exchange ("AMEX"), in late November 1969, commenced an investigation into the public relations activities of ECO and, more specifically, Koenig. Clearly there was justification for that investigation since the market price of ECO common stock, of which approximately 3.5 million shares were listed on the AMEX and held in public hands, had doubled from $14 to $28 per share in the last few months of 1969 amid rumors that the company was going to report extremely good earnings for 1969, that a major acquisition was in the works, that ECO was meeting with many stockbrokers and analysts and that it was touting its stock. Indeed the AMEX regularly investigates whenever any listed security becomes unusually active, either as to volume or price.

A preliminary investigation revealed that, in the preceding months, ECO had completed several acquisitions, including three Italian companies—Usuelli-ECO, Gallieni Vigano E. Marraza, and Sella Spa (of whom we will hear more later) —and had issued a great many press releases, all of which led the AMEX to conclude that further investigation was required. As a preliminary measure the margin on ECO stock was moved from 80% to 100%. This action, and the attendant publicity, precipitated a meeting, called at the request of Koenig, on December 3, 1969 at the AMEX. At that time Koenig advised the AMEX and its president, who was in attendance, that he was distressed that action had been taken without prior notification, that he sought a better relationship with the AMEX and that he was there in a constructive spirit. Shortly thereafter the AMEX wrote to Koenig raising various questions about ECO's public relations activities, private placements and related matters following which it was agreed that during the AMEX investigation all press releases or corporate communications would be cleared by ECO's counsel—a procedure which was followed all through 1970.

Koenig, however, was obviously upset by the margin requirements and by

what he considered to be the hostile attitude of the AMEX and its harassment of ECO. A further meeting was held at the AMEX in late February 1970 at which time the contents of various press releases, articles, brochures, speeches and other material relating to 1969 and the propriety of meetings with brokers and analysts were reviewed with Koenig. ECO had, at this time, retained new counsel who was to review its public relations activities. Still another meeting was held in late March 1970, at which Koenig was told that the staff of the AMEX felt that ECO had violated its listing agreement as to timely disclosure and publicity, that the AMEX was seriously considering delisting ECO and that ECO should submit a plan to the AMEX to show how these problems could be avoided in the future.

Shortly after this meeting, the AMEX learned that ECO had again changed counsel. Of more importance, on April 11, 1970, only two weeks after his last meeting at the AMEX, Koenig prepared two memos to the AMEX file. One, entitled "Eco Strategy", set forth Koenig's plan to deal with the "Amex harassment and interference in Eco's operations" and declared that he had no intention of stopping what ECO had been doing. In the second memo, "Amex Wrongdoings", Koenig charged, among other things, that "the Amex is guilty of manipulating the price of ECO stock downward in violation of the Securities Act of 1934." These memos were temporarily retrieved by ECO's Board at its April 22, 1970 meeting but ultimately fell into the hands of the AMEX and thence into the hands of the SEC. At this same meeting of April 22, 1970, ECO's Board received the newly issued AMEX disclosure guidelines and both the Board and Koenig took steps to see that these guidelines were complied with.

On May 14, 1970, the AMEX requested ECO to prepare a letter to its stockholders in order to clear up and correct certain prior disclosures. By this time ECO had again acquired new counsel to handle its difficulties with the AMEX and much of the summer of 1970 was devoted to the preparation of many drafts of such a letter, which efforts culminated in a draft in September 1970 which was of the type the AMEX could approve. On September 18, 1970, the defendant George V. R. Mulligan, a Los Angeles management consultant, became a member of the ECO Board. With a letter to stockholders in the offing it appeared that the difficulties with the AMEX could be resolved.

The SEC, however, which had been monitoring the AMEX investigation from time to time during 1970, commenced its own investigation of ECO by formal order on November 3, 1970. The likelihood that the SEC had come into possession of Koenig's "Eco Strategy" and "Amex Wrongdoings" cannot be discounted. The SEC then advised the AMEX not to approve the letter to stockholders or any other agreement with ECO. The SEC investigation came as a surprise to ECO and Koenig was directed by the Board to take all steps to have the investigation completed because of its effect on the ability of ECO to refinance its present short term obligations. Counsel for ECO met with the AMEX on November 3, 1970 and shortly thereafter the official in charge of the AMEX investigation recommended that ECO not be delisted on condition (1) that ECO continue to retain outside counsel having a thorough knowledge of the securities laws and AMEX disclosure policies (by this time yet another lawyer had been retained by ECO); (2) that Koenig not be involved with the corporate publicity and financial public relations aspects of the company; and (3) that the company form a publicity committee composed of one outside independent director, one outside independent counsel and the company's general counsel which committee would formulate guidelines and policies in the area of corporate publicity and public relations.

It appears clear to the Court that ECO was not delisted because the

AMEX could not produce adequate evidence proving that the past promotional activities of ECO involved misrepresentations, and because the company, over the period of the AMEX investigation, had responded to all questions, attempted to prepare a letter to stockholders, met with brokers only when accompanied by counsel, cleared all press releases, annual reports, etc. with the AMEX, and adopted guidelines covering disclosure. In short, ECO had complied with all of the AMEX's demands. The proposed conditions of the agreement with the AMEX were apparently acceptable to ECO, but the further condition of a consent decree in the SEC investigation was not received with any enthusiasm.

It was around this time, in December of 1970, that the previously amicable working relationship between Davidson and Koenig began to unravel. Concededly Davidson had previously supported Koenig in the AMEX dispute and had also supported the acquisition and publicity activities of ECO which had brought on that dispute. Now, however, with the settlement of the AMEX dispute not fully resolved, the SEC investigation in progress, and his own personal involvement and liability threatened, Davidson accused Koenig of holding the company together on "chewing gum and string" and suggested that Koenig resign as chief executive officer and become chairman of the board. Contemporaneously with the growing rift between Koenig and Davidson, the SEC investigation proceeded despite prior indications that no action was contemplated. But now the investigation was expanded to inquire into the accuracy of ECO's financial statements prepared by Haskins & Sells ("H&S"). This came at a time when ECO was awaiting the completion of the 1970 audit—the deadline being February 28, 1971—in time to file its 10–K due on March 31, 1971. ECO was in an extremely tight cash situation since permanent funds programmed for the fourth quarter of 1970 had not yet been funded due largely to the delay in the 1970 audit and the cloud hanging over the company as a result of the adverse SEC publicity. In April 1971, with the 1970 audit still not completed, proposed offers of settlement were again discussed with the AMEX and SEC, and Koenig and ECO agreed on a settlement as dictated by the AMEX and the SEC. On April 30, 1971, three documents were executed to effect this settlement.

First, Koenig consented to the entry of a judgment of permanent injunction by the District Court for the Southern District of New York. Part I of the order enjoined ECO, Koenig and "their agents, affiliates, subsidiaries . . . employees . . . and all persons acting in concert or participation with them" from making material misstatements and omissions as set forth, from employing any device, scheme or artifice to defraud, as specified, and from engaging in any transaction, act, practice or course of business which would operate as a fraud and deceit upon any person as specified. Part II ordered ECO to file a restated Form 10–K for 1969 to (1) show the inclusion of earnings as of acquisition closing dates or such earlier appropriate dates acceptable to the Commission and (2) expense certain 1969 salaries which had previously been capitalized.

Secondly, Koenig, on behalf of ECO, executed an understanding to the AMEX to (1) send out the letter to shareholders, (2) establish a publicity committee consisting of an independent director, a representative of an independent law firm and the company's general counsel to function as specified, (3) assign full control of publicity to an officer of the company to function as specified, (4) limit Koenig's public relations activities as specified, (5) continue to engage independent counsel "having a thorough knowledge of the securities laws", and (6) secure appointment of two "additional independent directors". In addition, ECO agreed to comply with the AMEX disclosure requirements, on the understanding that a breach of any of the foregoing could result in suspension or striking from listing or registration.

Finally, Koenig executed a letter to shareholders dated April 30, 1971 to "discuss and report" upon the subject matters of the SEC and AMEX inquiries. In it, Koenig described the AMEX undertaking, reviewed the extent to which ECO was engaged in pollution control and made full disclosure concerning certain "product developments" and ECO's 1968 and 1969 publicity campaign including the distribution of newspaper articles and brochures, the use of a public relations consultant and meetings with brokers and analysts.

Whatever had been accomplished by the settlement of April 30, 1971 with regard to removing the threat to ECO was, however, short-lived, for soon ECO began to experience problems with its auditors. H & S had commenced work on the 1970 audit in October 1970 in anticipation of the filing of ECO's 10–K due on March 31, 1971. Just prior to that time, ECO had submitted its, and its domestic subsidiaries', six-month financial statements—which were prepared in conformity with H & S' past accounting practices—to H & S for review and examination prior to their inclusion in an S–1 Registration Statement to be filed with the SEC in October 1971. Whether or not an actual "audit" was performed on those statements, it is apparent that H & S conducted a comprehensive review of the figures and, upon completion of the review, did not give any indication or warning to anyone that its prior accounting treatment of items such as the inclusion of the income of acquired companies, the recognition of income from uncompleted projects and the deferral of certain substantial costs were in any way suspect or subject to change—a situation which was to drastically change within six months.

While there may have been signs in February and March of 1971 that all was not well with the audit, it was not until April 21, 1971 that H & S advised ECO that significant adjustments might be necessary in the 1970 financial statements and it was not until May 19, 1971 that H & S submitted a detailed analysis of the proposed adjustments then amounting to approximately $4 million. Davidson had learned of the downward adjustments in mid-May and at H & S' suggestion, seconded by Davidson, H & S was invited to present their report on the situation at an ECO board meeting on May 20, 1971.

It was at this meeting that a further change of counsel occurred, this time due to the resignation of then present counsel. Attending the meeting was a representative of Union Bank, Los Angeles ("Union Bank"), a major creditor, and also representatives of the prospective underwriters for a proposed "shelf" registration, i. e., a registration covering the ECO securities given as consideration for the purchase of various subsidiaries. It is not surprising then, in the light of H & S' prior approval (or at least tacit approval) of the 1970 six-months statements, that the Board was shocked and expressed disagreement with H & S' proposed adjustments. As a result, H & S was directed to confer with ECO management on the following day. The Union Bank representative then reported on ECO's total debt of $13–$14 million and pointed out that the bank had reached its legal limit on overdrafts.

At the conclusion of the May 20 Board meeting Davidson moved for Koenig's removal as chief executive officer. Koenig responded by successfully moving a slate of directors for the forthcoming stockholders' meeting which excluded Davidson. Following the meeting Davidson called the AMEX and the SEC to inform them of the adjustments proposed by H & S. Trading in ECO stock was then suspended on May 20, 1971 by the AMEX and on May 25 by the SEC. With the exception of the period from August 9–17, 1971 when over-the-counter trading was resumed, the suspension of trading was to continue during the entire period covered by this indictment. On May 27, Davidson announced his intention to conduct a proxy fight against the current management. This action,

following the revealed downward adjustments in the company's financial statements, opened the door to a creditor takeover of the company.

The following months were to see the company beset by civil litigation and tottering on the brink of bankruptcy. Without detailing all that transpired over the summer of 1971, at least four events should be discussed, since three of these events led to press releases or reports which have been held to be misleading in the civil action herein, and the fourth relates to the alleged motive or purpose behind many of the actions attacked herein, *i. e.*, to maintain Koenig in office. The three events which led to press releases or reports which have been held to be misleading in the civil action are: (1) the foreign recapitalization; (2) the matter of a loan to ECO from Teachers Insurance and Annuity Association ("Teachers"); and (3) the Southwest Nuclear, Inc. ("SWN") project. The event relating to the alleged motive or purpose attacked herein is a certain meeting in Los Angeles with Union Bank on June 29, 1971 attended by ECO's management including most of its subsidiaries.

█ It is the Government's contention that in June 1971 Koenig, his control of ECO threatened by both Davidson and ECO's creditors, hatched two fraudulent schemes directed at the various security holders of ECO: a voting control transfer with respect to ECO subsidiaries in Europe and a proposed deal with SWN. Of course, as should be emphasized at this time, it is not a federal crime for management, faced with a proxy fight for management control, to fight back, so long as the methods employed do not violate federal law.

█ On June 29, 1971 a meeting was held in Los Angeles at Union Bank to discuss the current financial arrangements and the status of the as yet unfiled 1970 audit. At this meeting the heads of many of ECO's subsidiaries expressed their faith in Koenig and his ability to weather the current financial storm. The credible evidence does not indicate that such expressions were not made in good faith. The Court would note, at this point, that if management rallies to its support the heads of its subsidiaries this does not, in itself, constitute a case study in deceptive practices in violation of federal law. In June and July of 1971 the creation of an executive or finance committee proposed by Koenig to oversee the company's financial affairs was discussed with Union Bank as was the appointment of a management consultant designated by the bank and the raising of cash to pay the delinquent interest due Union Bank on its notes and/or ECO's overdrafts. While the company's relationship with Union Bank deteriorated, the proposed adjustments in ECO's financial statements caused serious concern over whether ECO's other principal lender, Teachers, would honor a previous commitment to lend ECO $4 million during 1971 which would be used to retire a "bridge loan" from Union Bank made in June 1970.

July of 1971 was a month of increasing difficulties and pressures on ECO. It will be recalled that it had once been expected that the 10-K for 1970 would be filed when due on March 31, 1971 but that substantial proposed readjustments by H & S had made this impossible. As a result, months were expended by representatives of H & S and ECO in an attempt to reach some agreement on the final figures. The SEC advised ECO that if it did not file the 10-K by August 2, 1971 a criminal action or a contempt proceeding would be commenced against it. While work on the footnotes to the financials which had been drafted by H & S commenced on July 23, 1971, the report could not be finalized until the company's status with its major creditors was clarified. It should be noted that the situation with respect to Union Bank and Teachers was extremely fluid. H & S was attempting to determine if the funding by Teachers was necessary to keep the Union Bank loans from being in default and to determine

what should be said, in the footnotes to the 1970 financials, about the status of the commitments, since it could not render an opinion while ECO remained in default under its present Union Bank loan agreements.

On July 28, 1971, however, Union Bank amended its loan agreements so as to cure any events of default then existing, including any default under the $4 million bridge loan agreement with Union Bank, and waived, as an event of default, any failure by ECO to receive the $4 million commitment from Teachers on August 1, 1971. Moreover, by prior amendment of the agreement, the Union Bank loan could not be called until such time as the Teachers' commitment was actually received by ECO. The agreement of July 28, 1971 was relied on by both H & S and ECO in the 1970 10-K.

Mention has been made of these events because the press release issued on August 3, 1971 in connection with ECO's filing of its 1970 10-K is the first of the press releases attacked by the Government as a misleading statement or omission under Rule 10b-5. While it is not the Court's purpose in this narrative to discuss *seriatim* the Government's contentions with respect to each and every press release, letter to stockholders, or periodic filing (particularly since the same charge is levelled in many cases against a variety of statements) a brief comment is in order with respect to this first "target" of the Government's attack.

This release, and others to follow, announced what can only be characterized as "bad" news. It disclosed a loss of more than $2 million in 1970 compared with a profit of $1.7 million in 1969; it disclosed a $1.17 per share loss in 1970 compared with a 50¢ per share profit in 1969; it disclosed a decrease in book value; it disclosed a negative cash flow; it disclosed downward adjustments in the 1970 financials totalling nearly $7 million. Despite this, the Government contends that the release gave a false and misleading portrayal of ECO's financial condition as of August 3, 1971

in that it failed to disclose, *inter alia,* that ECO was then in default in certain provisions of its renegotiated loan agreement with Union Bank and that as of July 28, 1971 ECO had reason to believe that it would not receive the committed $4 million loan from Teachers which was to be used to pay the $4 million Union Bank demand loan.

Whether or not the condition of the Union Bank loan and the Teachers' commitment were material developments, it is clear that on August 3, 1971 ECO was *not in default* of its loan agreement with Union Bank and, accordingly, it was immaterial whether Koenig or ECO had reason to believe that Teachers would not honor its commitment. It is interesting to note that as late as September 15, 1971 Teachers was still considering making funds available to ECO. Indeed, any statement in the press release such as the Government suggests should have been made, would not only have been misleading, but would also have been false. Finally, the Government asserts that the release was false and misleading because it failed to disclose a substantial projected cash flow deficit for the last five months of 1971. But nothing requires such a disclosure in a press release and, indeed, such disclosure is not required in the quarterly reports that must be filed with the SEC. Furthermore, the release *did* state that "the Company is experiencing a negative cash flow" and, on August 6, 1971 (three days later), whatever defect was present in the August 3 release regarding the amount of the cash flow deficit was cured by a press release giving the exact figure of a $4.7 million projected cash flow deficit for the balance of 1971, and repeated in a later release on August 19, 1971. Moreover, there is no evidence that this figure was known on August 3, 1971 by anyone at ECO, including the Publicity Committee which approved the August 3 release.

Before discussing the "Publicity Committee", a brief further reference should be made to the 1970 10-K which was filed on August 2, 1971 under extreme

pressure due, in part, to the fact that the final financials, footnotes and certification were not delivered to ECO in Florida until Saturday evening, July 31, with review and checking remaining to be done both in Florida and Washington, D.C. before the actual filing. Koenig had been far from satisfied with the adjustments made by H & S and had indicated that he would report not only H & S's adjustments but also what he believed the correct figures to be. As a result, H & S and the SEC were concerned that Koenig might disavow the financial statements either directly or indirectly. Accordingly, H & S waited until Koenig had agreed, in late July, to "accept" their figures before final preparation of the H & S opinion with respect to both the 1970 10-K and the restated 1969 10-K. Notwithstanding Koenig's agreement to the revisions, H & S nevertheless issued an opinion which was more harmful than helpful to ECO, since it stated that while the financial statements were prepared "on a going-concern basis" certain "uncertainties" existed, "the ultimate outcome of which could render invalid the assumption of a going concern". The effect of the revised financial statements and opinion of ECO's auditors on ECO's creditors will be considered after some general discussion of the Publicity Committee in connection with the press release and letters to stockholders which have been attacked by the Government herein.

It will be recalled that the Publicity Committee was established pursuant to the undertaking with the AMEX, which was part of the settlement agreement of April 30, 1971 and which was designed to limit and check the public relations activities of ECO and Koenig as they had been practiced in 1969. The agreement provided that the Committee be composed of an independent outside counsel, an independent outside director, and the company's general counsel. Although the critical position, in the view of the AMEX, was the outside counsel, and not the company's general counsel who would presumably be under Koenig's control, the agreement did not specify the particular individuals who were required to fill any of these positions. The Publicity Committee was formally established by Koenig on June 1, 1971 and was originally composed of three lawyers: defendant Byron S. Krantz; Abner Sibal (and James Treadway) of the firm of Gadsby & Hannah in Washington, D. C. as outside counsel; and Peter Adolph, general counsel of ECO. Although Krantz, at this time of his appointment was not a director of ECO, he was subsequently elected as an outside director on July 14, 1971. Robert Carter, administrative vice-president, comptroller and secretary of ECO, who had previously been appointed as Officer in Charge of Corporate Publicity, and who was to leave ECO in October 1971, was designated a Secretary to the Committee, although Adolph actually functioned as such.

The Committee first met on June 15, 1971 and agreed that it had a two-fold responsibility: (a) to edit and object to proposed press releases containing information not proper for a press release, and (b) to propose the release of information coming to its attention which it believed should be released. Releases were either reviewed by the members as a whole, or were discussed and reviewed by telephone. It is not clear whether there was always unanimity, but the AMEX undertaking itself did not require it. This process of review of all letters and releases issued by ECO continued throughout the summer of 1971. During the period that Sibal was on the Committee (he resigned as counsel in mid-September 1971), Koenig never sent out a release without it first going to Sibal for approval and all releases during this period, many of which are now attacked by the Government, were approved by all the members of the Committee. Furthermore, proposed releases were read to the SEC and copies of all releases sent to it, without any indication from the SEC that the releases were false or omitted any material facts. Indeed, the Government has failed to

prove any of the releases or letters which it now asserts are criminally false and misleading were ever sent out without prior review and approval by the Publicity Committee. Incredibly, neither Sibal, Treadway nor Adolph are named as co-conspirators by the Government so that Krantz was, allegedly, the only one criminally involved in the distribution of misleading and deceptive information during this period, although he was in no position to control this Committee.

After September 16, 1971 Murray Chotiner and defendant Reeves replaced Sibal's firm as outside counsel on the Committee and John Downs, a friend of Chotiner, also joined the Committee. Chotiner and Downs have both been named by the Government in its bills of particulars as co-conspirators. Although Downs did not become a director until March of 1972 and Krantz resigned as a director on October 20, 1971 (and did not rejoin the Board until March of 1972), for a period after September 16, 1971 the Committee consisted of Downs, Krantz and Adolph together with Reeves and Chotiner. While the Government claims that defendant Mulligan was a member of the Committee after September 16, 1971, there is no evidence linking him to the preparation or review of any press release, letter to shareholders or SEC filing issued during the period after September 16, 1971 except for the letters to stockholders of September 17, 1971 and February 23, 1972 and the first amended 10-K filed on July 11, 1972. The evidence does not establish that he was at any time a member of the Committee.

Before continuing the chronological narrative of the facts, it is important to note once again that during the entire period in which the Government claims that misleading or false releases and statements were issued, these releases and statements were passed on and approved by persons who are not defendants in this case.

ECO's real problems did not end with the filing of the 1970 10-K on August 2, 1971. The creditors, primarily Union Bank, faced with the increased adjustments in ECO's financial reports and the damaging opinion of its auditors, continued to push for Koenig's ouster and for control of the company. On August 6, and again on August 16, creditors' meetings were held. In the meantime, however, the Chase Manhattan Bank called its $500,000 loan and Union Bank in turn cancelled its cash arrangement reached with ECO in the latter part of July. At the creditors' meeting of August 16 the creditors jointly decided not to make any further funds available to ECO and, following the meeting, Union Bank called its $4 million bridge loan. In the face of imminent disaster, the ECO Board of Directors met on August 18. It was agreed that one of the causes of the company's deteriorating relationship with its creditors was the proxy fight instituted by Davidson and, in a peacemaking attempt, it was finally agreed that the Board should be divided by a formula which would give Davidson and Koenig equal 40% representation with the remaining 20% elected by the combined 80%.

Despite this agreement Union Bank then called ECO's $9.3 million loan, asserting as an event of default the company's failure to pay the bridge loan. Although in the latter part of August Union Bank and Teachers met and agreed upon a conditional rescue plan for ECO—conditioned principally on Koenig's resignation as chief executive officer and the establishment of a Board of Directors controlled by Union Bank and Teachers—the situation was not one for optimism when the Board met on September 8, 1971. It was at this meeting that Koenig first reported on the progress of what has been referred to as the European recapitalization. Since it is this involved and complicated series of transactions that is the basis for almost all of the charges levelled against these defendants in the indictment and various *bills* of particulars, an analysis of the transactions is necessary at this time.

ECO, on June 15, 1971, controlled 100% of the stock of ESSA (Ecological Science S.A.), a Swiss company formed in 1969. ESSA, in turn, controlled three Italian companies: (a) Usuelli, of whose stock ESSA controlled 100%; (b) Gallieni, of whose stock ESSA controlled 90% with 10% controlled by Sirpi, another Italian company; and (c) Sella, of whose stock ESSA controlled 90% with 10% controlled by an individual named Rollando Zanotto (through a holding company known as Zendall). ESSA had acquired this stock during 1969 or early in 1970. All three companies were involved in related ecological activities. Sella manufactured big valves for pipelines, Gallieni smaller valves and plumbing, and Usuelli air control devices, incinerators and similar products. The lawyer for ESSA was Claudio Camilli of the firm of Baker & McKenzie. In mid-1970, in order to maximize the tax benefits for the subsidiaries, ESSA was converted, in part, to an operating company in that it took over export sales for Sella so that ESSA could bill Sella's foreign customers and accumulate this money in Switzerland, thus escaping the high Italian taxes and obtaining the benefit of the lower Swiss taxes. ESSA would purchase the raw materials or semi-finished products, have them processed by Sella with ESSA receiving an invoice from Sella for the work done and ESSA would then bill the ultimate customer. It was contemplated that ESSA would repatriate this money to Sella in the form of loans or subscriptions to capital at a later date.

Early in 1971, the concept of a partnership to handle engineering services in Europe in order to minimize Italian taxes was devised. In order to secure such minimization, Italian law required that an individual be the general partner and a foreign corporation be the limited partner of this new entity to be known as ECO-SAS. Accordingly, it was decided that Koenig would be the general partner and that Brown Fintube S.A. ("BFT(S)") would be the limited partner. BFT(S) was a Swiss company wholly owned by Brown Fintube, an American corporation which in turn was wholly owned by ECO.

Recapitulating, then, as of June 15, 1971, ECO owned, through ESSA, the three Italian subsidiaries and the creation of the partnership in Italy, i. e., ECO-SAS, was well under way. As of that date, the board members of ESSA were Cesare DeFranceschini, an Italian citizen, Koenig, and three Swiss attorneys, and, at least as early as July or August 1971, the board of BFT(S) was the same. DeFranceschini was also the general manager of ESSA and BFT(S). Also, as of June 15, 1971, the board of Usuelli consisted of DeFranceschini, Koenig, the general manager of Usuelli, and Mr. Usuelli; the board of Gallieni consisted of DeFranceschini, Koenig, the general manager of Gallieni, and Mr. Gallieni; the board of Sella consisted of DeFranceschini, Koenig, the general manager of Sella, and Mr. Zanotto.

On the same date, June 15, 1971, the annual meetings of the three Italian companies, i. e., Usuelli, Gallieni and Sella, were held and attended, among others, by Koenig, DeFranceschini and Camilli, ESSA's attorney. After these meetings, a further meeting was held and attended only by the last mentioned three individuals at which Koenig described the difficulties which had arisen with respect to the parent company, ECO, in the United States and its possible consequences for the European subsidiaries. Among the difficulties described was the audit problem, the profitability tests in connection with loan agreements and the possible loss of expected financing. On the following day, June 16, an informal meeting was held and attended by DeFranceschini, Koenig, Camilli and two Swiss lawyers, Spiess and Cavazonni.

Over the course of these two days of meetings, the various financial problems of the Italian operating companies were discussed. It should be noted that at that time ESSA was indebted to Union Bank, Switzerland (backed up by a letter of credit from Union Bank) in the

amount of $2 million and that ESSA still owed payments to several individuals for the purchase of the Italian operating companies (including some $1.8 million to Zanotto for the purchase of Sella). ESSA was also indebted to ECO for approximately $3 million. Furthermore, the Italian banks, which were aware of ECO's problems and which had already withdrawn $700,000 in lines of credit previously extended, were now contemplating the withdrawal of working capital lines of credit. It should be noted that ESSA was carrying substantial accounts receivable (due from customers of Sella's products) and accounts payable (due to Sella for the manufacture of those products) under the arrangement discussed *supra*.

Thus, there were four principal areas of concern discussed at these meetings: (1) that ECO's creditors might somehow attach the loan from ECO to ESSA and thus jeopardize the receivables which ESSA held; (2) that Union Bank Switzerland (or Union Bank through subrogation of the letter of credit) could jeopardize the same receivables by calling its loan; (3) that Zanotto would, upon default of the payment due him, execute upon the pledge of Sella stock which he held as a result of ESSA's purchase of Sella; and (4) that as a result of the foregoing, the Italian banks would withdraw their remaining lines of credit. All of these possible actions would have the same devastating consequence—the failure of the Italian operating companies due to a lack of working capital. Thus, those in attendance at the meetings agreed that some "plan" was necessary to deal with these contingencies and save the operating companies.

Various possible solutions were discussed at the meeting on June 15, 1971 and, as already noted, a further conference was held the following day at the request of Mr. Spiess, a Swiss attorney and one of the directors of ESSA, where the situation in the United States was again discussed. One idea, suggested by Camilli, was a personal assurance con-

tract entered into by the management of the Italian subsidiaries. This was rejected by Koenig as not providing the stability required by the Italian banks because such a contract might easily be breached. Koenig himself had suggested that the subsidiaries give some sort of security to the banks in the form of mortgages on real estate owned by the subsidiaries or by pledging inventories or receivables. This, too, was rejected either because Italian law did not permit such transactions or because the banks simply did not do business that way. It was also proposed that several partnerships, consisting of management and the operating companies, be formed in order to create the "stability" required by the banks. This idea had more promise.

After further discussion, it was generally agreed that what was required was not several partnerships but rather one Italian partnership which would exercise voting control of the Italian subsidiaries (which would be accomplished by creating different classes of stock in the operating companies). There also appeared to have been some discussion that ECO–SAS might be used as the Italian partnership in the plan. There was, however, no final agreement on the details of the plan and, indeed, it was discussed only in general terms. It was also agreed that the problem of the ESSA receivables and payables might be resolved by transferring them to BFT(S) and by restoring ESSA to holding company status and allowing Sella to do its own distributing. Further, with regard to BFT(S), Spiess was asked whether an arrangement similar to the one discussed for the Italian subsidiaries could be worked out for BFT(S). Spiess replied that he thought so but that a Lichtenstein Anstalt—a business entity peculiar to Lichtenstein, the ownership of which is evidenced by a bearer certificate—was a more appropriate vehicle. At any rate, the meetings ended with Koenig's instructions to work out the plan and report back to him.

A week after the meetings of June 15 and 16, 1971 and after Koenig had re-

turned to the United States, Camilli and DeFranceschini met again and discussed the use of the Italian partnership ECO–SAS, then in the process of formation, as a vehicle to acquire voting control of the three Italian subsidiaries through control of Usuelli which in turn would acquire control of Gallieni and Sella. This was explained to Koenig by phone the following day. It is important to note that 100% of Usuelli was owned by ESSA so that a meeting to effect transfer of voting control of Usuelli to ECO–SAS could be accomplished rapidly. However, ESSA held only a 90% ownership in Gallieni and Sella which would necessitate calling board meetings and thereafter stockholders meetings to effect the transfer of voting control in these two companies to Usuelli. Also to be considered was the right of the minority stockholders of Gallieni and Sella to subscribe to any new stock that might be authorized, which could make it difficult to undo any recapitalization if it was later deemed inadvisable to go through with it.

Accordingly, a shareholders meeting of Usuelli was held on June 25, 1971 at which time authority was granted to increase the capital of Usuelli by issuing 80,000 new shares, the prior authorization being for 200,000 shares. The total 280,000 shares were then split into two classes, Class A and Class B of 140,000 shares each with only Class A to have full voting rights and Class B to have voting rights only in case of amendment of the corporate by-laws or change in the structure of Usuelli. Class A had limited dividend rights with the major dividend rights in the Class B shares. It was understood that ESSA was to have 140,000 B shares and 60,000 A shares with 80,000 A shares to go to the new Italian partnership ECO–SAS. However, no actual subscription to the new shares was effected on June 25, 1971.

On July 2, 1971 board meetings of Gallieni and Sella were held for the purpose of calling the necessary shareholders meetings. Also on July 5 a meeting was held between DeFranceschini, Camilli and Spiess to discuss the proposed recapitalization of BFT(S). This involved increasing the capital of BFT(S) by issuing shares having a par value which was one-tenth of the par value of the prior shares but which would have the same voting rights. The new shares were to be offered for subscription to the existing shareholders who were expected to waive their preemptive rights and the stock would thereafter be subscribed to by the Anstalt.

On July 7, 1971 the formal papers for the creation of the partnership, ECO–SAS, were signed. Except for the creation of this new entity, the general status of the European subsidiaries remained the same. However, as has been indicated, the shareholders meeting of Usuelli had already been held, resulting in authorization for the increase of its capital, the issuance of new stock and the division of all the stock into two classes, one of which had full, the other limited, voting rights. Moreover, board meetings of Gallieni and Sella had also been held at which time stockholders meetings were scheduled for July 22, 1971. DeFranceschini, however, advised Camilli in mid-July that the situation with respect to creditors seemed to be improving in the United States and the stockholders meetings of Gallieni and Sella were adjourned until August 27, 1971. This is of significance in light of the Government's charges that press releases by ECO in August violated Rule 10b–5 by failing to disclose the planned transfers relating to the Eurpoean subsidiaries.

Around mid-August Camilli was instructed to proceed with the stockholders meetings and on August 27, 1971 the adjourned meetings of Gallieni and Sella were held. In addition, a board meeting of Usuelli was held to accept the subscription by ECO–SAS for the stock of Usuelli which had been authorized in June. At the shareholders meeting of Gallieni the capital of Gallieni was increased by issuing 120,000 new shares making a total of 420,000 shares which

in turn were split into two classes, Class A with 210,000 shares and Class B with 210,000 shares, these classes having practically the same voting differentiation as was the case with Usuelli. At the meeting of the shareholders of Sella a somewhat different procedure was followed. First the existing 16,000 shares were split equally into two classes, A and B, with the same voting characteristics as the Usuelli and Gallieni shares. One share of each class was assigned to the shareholders for each two shares of the old stock. Then the capital was increased by the issuance of an additional 10,500 shares of A stock, the stock with full voting rights. The reason for the different procedure was that any other would have required a unanimous vote of the shareholders. This was not a problem with Usuelli where there were no minority shareholders, or with Gallieni since Sirpi, the sole minority shareholder, was in agreement. However, in the case of Sella, there was some question as to whether Zanotto, the sole minority stockholder, would agree —indeed, he abstained from voting.

On the same date the subscription of the stock of Gallieni and Sella by Usuelli was effected and a meeting of the shareholders of BFT(S) was held to effect the increase of capital and the subscription to 1,080 shares of BFT(S) by Steinteil Handels-Anstalt ("SHA"), a Lichtenstein Anstalt. On the same date that these meetings were held, Speiss produced the necessary bearer papers for SHA.

Therefore, at the close of business on August 31, 1971, the following situation existed among ECO's European subsidiaries. ESSA and Brown Fintube (the American corporation) continued to be wholly owned by ECO. However, ESSA's voting control over Usuelli, Gallieni and Sella had been eliminated. Of the 18,500 shares of Class A stock of Sella carrying full voting rights, 9,450 shares or 51% were transferred to Usuelli, 1,850 shares or 10% of the Class A stock and 800 shares of the Class B stock were transferred to Zanot-

to, and the balance of 7,200 shares of A stock (39%) and 7,200 shares of B stock were transferred to ESSA. Of the 210,000 shares of Class A stock of Gallieni, 120,000 shares or 57% were transferred to Usuelli, and the balance of 90,000 shares plus 180,000 shares of Class B were transferred to ESSA, the balance of the B stock, i. e., 30,000 shares, going to Sirpi. Of the 140,000 shares of Class A voting stock of Usuelli, 80,000 or 57% were transferred to ECO–SAS and the remaining 60,000 shares plus the entire 180,000 shares of Class B stock were assigned to ESSA.

At the same time, ECO's voting control over BFT(S) through its wholly owned American subsidiary, Brown Fintube, was eliminated. Of the total 2,102 shares of BFT(S), 1,080 shares or voting control was subscribed to by the SHA and the balance of 1,022 shares were held by ECO's American subsidiary, Brown Fintube. Thus, as of August 31, 1971 voting control of Sella and Gallieni was in Usuelli; voting control of Usuelli was in the Italian partnership ECO–SAS composed of Koenig as general partner and BFT(S) and BFT(S) was controlled by the Anstalt SHA.

One further transfer of shares subsequent to August 31, 1971 should be mentioned. Under the reorganization as then accomplished, Koenig, as general partner of ECO–SAS, rather than SHA through its control of the limited partner BFT(S), was the dominant figure since he, rather than his corporate partner, controlled ECO–SAS. Koenig, however, had antagonized one of the principal creditors of the Italian companies, i. e., Credito Italiano, so that it was decided that BFT(S) should acquire the majority of the voting shares of Usuelli. Accordingly, a meeting of the shareholders of Usuelli was held on September 21, 1971 at which time the capital of Usuelli was increased by the issuance of an additional 400,000 new shares of Class A voting stock of which 286,000 were subscribed to by BFT(S) and 114,000 by the partnership ECO–SAS. Thus, BFT(S) ended up with 286,000 shares,

ECO–SAS with 194,000 shares, and ESSA, having waived its preemptive right to subscribe, with 60,000 shares of the Class A stock.

The result of all these maneuvers was that SHA controlled BFT(S) which, in turn, controlled Usuelli which, in turn, controlled Gallieni and Sella. Although there is some confusion as to whether the SHA bearer certificate, which evidenced ownership of the Anstalt, was continuously held by Spiess (who had endorsed "ESSA" on the envelope containing the bearer certificate) or whether it was held by DeFranceschini as a fiduciary for ESSA, the end result was the same—the ultimate voting control of the Italian subsidiaries remained with Koenig and DeFranceschini—just as it had before the various recapitalizations and despite the changes in intercorporate control effected over the summer of 1971. This is of the utmost importance in the light of the Government's allegations that Koenig appropriated the Italian subsidiaries to his own benefit. Koenig exercised the very same control over the subsidiaries both before and after the recapitalization—no more and no less.

At the September 8, 1971 meeting of ECO's board, Koenig and DeFranceschini reported on the status of the voting control realignment of the foreign subsidiaries. Although the number of new shares of the various companies or the classification of stock was not revealed, the board was informed that voting power was not in the hands of ECO anymore, that ECO–SAS had voting control of Usuelli which in turn had voting control of Gallieni and Sella, that the Lichtenstein company had voting control of BFT(S), that no money was involved since all dividends would still go to ECO, that nothing irrevocable had been done, and that the board could direct Koenig or DeFranceschini to do whatever the board felt was in the best interests of the stockholders of ECO. The initial reaction of the board was that further information was needed before it could ratify or reject the transactions, and the matter was tabled pending receipt of that information. Furthermore, not only was the board informed but so were the creditors.

A further meeting of the board was held on the evening of September 16, 1971. Koenig had appeared that afternoon before the SEC to answer questions with respect to the recapitalization and other matters. Prior to the board meeting, Koenig, Mulligan, Krantz, Reeves and DeFranceschini, among others, met and agreed to continue the tabling of the European recapitalization and to remove Davidson from the board. Certainly Davidson's actions in dealings with ECO's creditors over the past summer fully warranted such action. At the meeting itself Davidson was removed, Koenig elected Chairman of the Board in his place, and after a brief report by DeFranceschini on the European recapitalization, the matter was continued as "tabled". Grinnell Morris, who had moved to rescind the recapitalization and had voted against the election of Koenig, resigned at the close of the meeting. Shortly after the meeting, Union Bank, which had been unsuccessful in obtaining the removal of Koenig and control of the board, served the members of the board with a summons and complaint seeking payment of its outstanding loan.

During the same period, work had commenced on the quarterly 10–Q reports to be filed with the SEC. Although the SEC had denied ECO's request for an extension of time for the filing of the March and June 10–Qs and ECO's prior counsel had advised against any filing of these reports until the dispute with H & S was resolved, the company's new SEC counsel, including Reeves, believed such filings to be necessary. Thus, the 10–Qs were filed on September 17, 1971 and were thereafter filed on a regular basis. Furthermore, it became ECO's practice from the fall of 1971 through 1972 to file 8–K reports with the SEC every month.

As must be apparent, in the fall of 1971 ECO's relationship with its creditors had deteriorated to the point where it became a race to the courthouse. In a maze of lawsuits, ECO counterclaimed against Union Bank; Teachers and the Florida Public Service Commission sued Eco Utilities, an ECO subsidiary; ECO counterclaimed against Teachers and sued H & S; a Florida court decided to appoint a receiver over Eco Utilities, and ECO went to the Florida court to put Eco Utilities into Chapter XI bankruptcy; and ECO sued Davidson. All of this litigation was the subject of press releases issued by ECO. In all, some 29 separate lawsuits, ranging from creditors' actions to stockholder derivative suits, were pending against ECO on November 14, 1971. The financial situation of the company was in a shambles and the future of the company, if any, was tied up in litigation.

At the same time, the SEC was continuing its investigation of the European recapitalization and was making inquiries regarding the Southwest Nuclear project which had been described in a letter to stockholders on September 27, 1971.

This "project" was first mentioned publicly by Koenig at the Union Bank meeting on June 29, 1971 at which time Koenig read a letter, dated June 28, 1971, from himself to Union Bank. The letter disclosed an award to two ECO subsidiaries of a feasibility study of a $300 million Atomic Energy Power Plant in the western area of the United States, such award being contingent upon the continuance of present ECO management. The idea for this project did not originate with any of the defendants but with one Ross Bohannon who mentioned it to Mulligan early in 1971 and Mulligan, aware of the ecological interest and capabilities of ECO, introduced Bohannon to Koenig.

Following the June 29 meeting, and on July 31, 1971, a contract was entered into between Southwest Nuclear, Inc. and Rader & Associates, an ECO subsidiary, conditioned upon the continuance of present management. In mid-September, Rader & Associates issued a preliminary report indicating the project was feasible from an engineering and economic standpoint. Although reference to the project had appeared in drafts of press releases and letters to stockholders in August and September, such material had not been issued. However, the September 27, 1971 letter to stockholders from Koenig mentioned the selection of ECO to conduct "an interdisciplinary feasibility study for an ecologically sound, nuclear fueled electric generating plant in the U. S.". The project was further discussed in a second letter enclosed with the letter to stockholders. It is this enclosed letter which is the basis for the charges contained in Counts 1, 3, 20 and 23. The letter is quite short and reads as follows:

"September 27, 1971

"TO OUR STOCKHOLDERS:

"In all of the science of ecology, nuclear power is the most exciting.

"The promise of nuclear power lies in the creation of energy without burning fossil fuels, notorious as atmospheric pollutants.

"The expertise of our Rader and Associates engineering subsidiary, coupled with our Woodard Research Corporation and Ecological Engineering, Inc. skills, covering the capabilities for the design, construction and operation of pollution-free, ecologically sound nuclear power plants has been recognized by Nevada-based Southwest Nuclear, Inc., in the selection and appointment of Rader and Associates for an initial fee of $150,000 to conduct preliminary studies of the economics, design, construction and operation of a nuclear-powered electric generating plant in southwest Nevada.

"This result of our team effort is the most noteworthy single event in Ecological Science's recent history. I call this achievement to your attention

so that you may follow our progress as Rader and Associates use their engineering and technical skills and those of our other subsidiaries to protect America's environment and further the progress of our Corporation.

"Cordially,

/s/ Harold P. Koenig

Harold P. Koenig

Chairman and President"

Although this letter will be more fully discussed *infra*, it should be noted at this time that neither the indictment nor the bills of particulars makes any claim that any of the information contained in this letter was false or misleading or that it even exaggerated the information which was set forth therein. The claim is that additional information should have been furnished without which the information contained in the letter was misleading. Furthermore, this letter must be read in connection with the letter to stockholders of the same date containing the report for the disastrous first six months of 1971 and the press release of the same date describing the litigation between ECO and Union Bank, all of which was sent to the stockholders along with the Southwest Nuclear letter.

In order to resolve the difficulties with the SEC emanating from the European recapitalization and the Southwest Nuclear project, a letter to stockholders was drafted in early November and sent to the Publicity Committee for its comments. The letter, however, was disapproved on November 17, 1971 and, on that same day, the SEC commenced an action in this court for injunctive and ancillary relief against ECO, ECO–SAS, SHA, Koenig and DeFranceschini. The action alleged, *inter alia*, a misappropriation of assets, the filing of false SEC reports, and the publication of false statements and sought an injunction covering further false statements, the appointment of a receiver for ECO and its properties, and affirmative relief requiring the defendants to rescind the European recapitalization. DeFrances-

chini, incensed over the attack on him by the SEC, returned to Italy and transferred back to ESSA the control over the European subsidiaries then held by SHA on behalf of ESSA.

In the meantime, in mid-November Koenig had explained to Union Bank many of the details of the European recapitalization and further details were furnished to Union Bank by DeFranceschini and ESSA's attorney in Italy early in December. Thereafter, Union Bank and ECO in meetings in Europe, the Bahamas, and the United States worked out a proposed settlement of their differences. After reaching an agreement in principle with Union Bank in January 1972 to settle the litigation, to refinance ECO's $15 million short-term debt on a seven-year basis, to provide ECO with an additional long-term loan of $1 million to reduce other ECO debt, and to cancel over $1 million of interest, ECO was able to work out—over a period of time—new credit arrangements with most of the company's subsidiaries' local creditors (*e. g.*, the Chase Manhattan Bank and New York Life Insurance Co.). Agreement in principle to settle the Teachers litigation and pay off the Teachers loan of $6,112,500 in cash, at a substantial discount, and for Teachers to forgive payment of some $400,000 past due interest was reached shortly after the Union Bank settlement was negotiated. ECO also later obtained approval for a plan of arrangement to remove its wholly-owned utilities subsidiary from Chapter XI proceedings, and regained control of the company's utilities operations.

On June 19, 1972 Judge John Cannella issued a memorandum opinion ordering a receiver to supervise and correct ECO's filings, finding on the uncontradicted evidence that failure to fully disclose the European transactions in its annual report and three quarterly reports for 1971 was in violation of § 13(a) and Rules 13a–1 and 13a–13. On July 14, 1972 this court's second injunction against violations of Rule 10b–5 also became effective.

New auditors had been hired by the company to work on the 1971 audit. Their opinion was clear and unqualified and, in effect, certified that all of ECO's European assets and earnings during 1971 had remained in the ECO family. Dissident stockholder activity continued, however, despite signs of economic recovery on the part of ECO. On December 3, 1972 Koenig resigned.

## IV. THE CHARGES

### A. *The Conspiracy Count* (Preliminary Considerations)

Count 1 of the indictment charges that, for the purpose of maintaining Koenig as chief operating officer of ECO, and to defraud ECO's creditors, shareholders, the public and the SEC, an agreement was reached among the defendants to violate various federal statutes, *i. e.*, to violate the periodic reporting requirements under the Securities Acts and the mail fraud statute through the filing of 10–K, 10–Q, and 8–K reports which contained false and misleading statements, and to violate. § 10(b) and Rule 10b–5 and the mail fraud statute through the issuance of false and misleading press releases and letters to shareholders. It is also alleged that the defendants conspired to violate the consent decree entered into with the SEC on April 30, 1971 by ECO and Koenig. The indictment specifies these objects in more detail under the heading "Objects of the Conspiracy". (Count 1, ¶¶ 14 through 17).

In addition to these objects, the indictment enumerates several actions which it labels "Means of the Conspiracy". These include agreeing to the consent decree, the planning, execution and concealment of the European recapitalization, the SWN project, and various efforts to prevent the Koenig management from being removed from office by Davidson and his supporters, creditors and others. Although it is alleged that the conspiracy ran from January 1, 1971 up to and including December 31, 1972, the earliest of the means by which the conspiracy was to be effected was the consent to the order entered in this court on April 30, 1971 and the date of the first alleged overt act was August 17, 1971.

On these motions the Court must determine whether on the evidence at this juncture, considered in the light most favorable to the Government, a reasonable mind might fairly conclude beyond a reasonable doubt that (a) the conspiracy as charged in the indictment actually existed; (b) that the object of the conspiracy was to violate federal law or to achieve a legitimate goal through the violation of federal law; (c) that the particular defendant under consideration knowingly and willfully—*i. e.*, with at least the same degree of intent as required for the substantive offenses alleged to be the objects of the conspiracy—became a participant in the conspiracy; and (d) that at least one of the conspirators knowingly committed an overt act in furtherance of the conspiracy.

The evidence adduced by the Government does indicate that for most of the period charged in the indictment Krantz and Mulligan acted in such a manner as to give support to Koenig rather than Davidson in the latter's effort to unseat Koenig. The evidence also shows that at various times Krantz disagreed with Koenig and eventually resigned from the ECO board after Koenig did not comply with Krantz' suggestion that he resign. These concerted actions might be as easily explained by a finding that Krantz and Mulligan *independently* concluded that Koenig's management of ECO was satisfactory as a finding that a "conspiracy" existed to keep him in power. The Court concedes, however, that a reasonable mind could find beyond a reasonable doubt that Krantz and Mulligan had, on occasion, tacitly agreed to support Koenig.

The same cannot be said with respect to the Government's case against Reeves. The evidence shows that he did not even come into contact with ECO until early September 1971. He was not

699

a member of the ECO board, nor was he a member of its management. His sole responsibility was as ECO's outside securities counsel. His actions in no way contributed to Davidson's ouster and Koenig's subsequent installment as ECO's Chairman of the Board. While the Government asserts that Reeves was instrumental in concealing the illegal acts which kept Koenig in power, the evidence as developed *infra* does not permit the conclusion that either any illegal acts were committed or, assuming that such acts were committed, that Reeves knew or should have known of them.

Assuming, *arguendo*, that *all* of the defendants agreed to help Koenig, the crucial question is whether a reasonable mind could conclude beyond a reasonable doubt that any of the defendants knowingly agreed to violate federal law to effect Koenig's continuance in office. If the Government has failed in this respect, then it has not established elements (b) and (c) as outlined above and a judgment of acquittal must be directed on this count. Since there is no "direct" evidence of any such agreement—*i. e.*, no witness testified, nor any document attested, to a formal agreement—the Government must rely on circumstantial proof of that agreement by showing that actual or attempted violations of federal law occurred with the participation of the defendants. Furthermore, in attempting to establish this agreement to violate federal laws the Government must also show that the defendants acted with criminal intent—*i. e.*, that each defendant must have possessed *at least* the same degree of intent as required for the substantive offenses alleged to have been the objects of the conspiracy. Ingram v. United States, 360 U.S. 672, 79 S.Ct. 1314, 3 L.Ed.2d 1503 (1959).

The Supreme Court held, in *Ingram*, that in order for a defendant to have criminal intent to commit the crime of conspiracy he must have knowledge of the unlawful purpose of the conspiracy and that the requisite knowledge, in turn, would have to be the same as that required by the substantive offenses which are alleged to be the objects of the conspiracy. Ingram v. United States, *supra*, 360 U.S. at 678–679, 79 S.Ct. 1314. In other words, in the instant case the Court must find that each defendant had the same knowledge necessary for a conviction under §§ 10(b), 12 and 13 of the Exchange Act and the mail fraud statutes in order for the Court to find that he knowingly joined the conspiracy with intent to further its objectives.

The resolution of these questions, however, involves issues which are integral to the determination of guilt with respect to the substantive counts. Accordingly, the Court will pass to a consideration of the substantive counts and then return to the conspiracy count when all such issues have been resolved. In so doing, the Court is mindful that much of the evidence relating to the substantive counts was hearsay provisionally admitted under the declarations of a co-conspirator exception. However, solely for the purposes of the instant motions, the Court will consider all the evidence adduced by the Government in the light most favorable to it.

B. *The Exchange Act Violations*

1. *The § 10(b) and Rule 10b–5 violations*

Substantive Counts 2 and 3 charge violations of § 10(b) and Rule 10b–5 in connection with the European recapitalization and the SWN project respectively.

With respect to each defendant charged, the Government must prove beyond a reasonable doubt that he *willfully*:

(a) employed a scheme to defraud, or (b) *misrepresented* or *failed to disclose* a *material fact,* or (c) engaged in a *course of business which operated as a fraud,*

in connection with the *purchase or sale of any security.*

Although the Government has suggested or asserted various theories as to the manner in which the respective defendants violated § 10(b) and Rule

10b–5, the portions of the elements of the substantive offense italicized above would appear to point to those key findings of fact and law dispositive of the instant motions. In more detailed form, the issues are:

(1) Was there a misrepresentation of or failure to disclose facts?

(2) Were the facts alleged to have been misrepresented or not disclosed material within the meaning of the rule?

(3) With respect to the European recapitalization of the subsidiary companies, was this an appropriation of ECO's assets, i. e., was it a course of business which operated as a fraud?

(4) Did the particular defendant act with the requisite scienter, i. e., did he act willfully?

(5) Were any ECO "securities" being traded at the time of the alleged fraud?

(6) Were the alleged fraudulent activities in connection with the purchase or sale of those securities?

 Much of the Government's case (with respect to the counts presently under review and the subsequent counts) relates to the charge that certain reports required to be filed with the SEC and the AMEX, and certain press releases or letters to stockholders were misleading due to a misrepresentation of or failure to disclose facts. A statement, whether it be a report, press release, or letter to stockholders, can be misleading for either of two reasons: the items disclosed do not describe the facts accurately, or insufficient data are revealed.

"The misleading, misrepresented or untruthful character of the release may appear from the nature of the statement considered alone, or, when the facts are fully disclosed, from the half truths, omissions or absence of full candor concealed therein." Mitchell v. Texas Gulf Sulphur Co., 446 F. 2d 90, 97 (10th Cir.), cert. denied, 404 U.S. 1004, 92 S.Ct. 564, 30 L.Ed.2d 558 (1971) and 405 U.S. 918, 92 S.Ct. 943, 30 L.Ed.2d 788 (1972).

 With respect to a failure to describe the facts accurately, the determination of whether a press release is misleading under the law in this Circuit depends upon whether the release "conveyed to the public a false impression of the . . . situation at the time of its issuance." SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 862 (2d Cir. 1968) (en banc), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). The Court must determine "the character of the release in the light of the facts existing at the time of the release, by applying the standard of whether a reasonable investor, in the exercise of due care, would have been misled by it." 401 F.2d at 863. Investors and stockholders can, however, be presumed to have a general understanding of the business world when determining whether a statement is misleading. See, e. g., Symington Wayne Corp. v. Dresser Industries, Inc., 383 F.2d 840, 843 (2d Cir. 1967); Gulf & Western Industries, Inc. v. Great Atlantic and Pacific Tea Co., Inc., 356 F.Supp. 1066, 1071 (S.D. N.Y.), aff'd, 476 F.2d 687 (2d Cir. 1973); Richland v. Crandall, 262 F.Supp. 538, 554 (S.D.N.Y.1967); Jacobs, What is a Misleading Statement or Omission under Rule 10b–5, 42 Fordham L.Rev. 243, 248 (1973) (hereinafter "Jacobs").

 "Whether a statement is misleading for the second reason—failure to disclose sufficient data—depends on the context in which the statement is made. When securities are bought, sold, or held on the basis of the statement, sufficient facts must be disclosed so that an informed investment decision can be made." Jacobs, supra, 42 Fordham L. Rev. at 248. It must also be noted that the accuracy of a statement is measured at the time that it is made. Jacobs, supra, 42 Fordham L.Rev. at 253.

 The Government has alleged that the defendants have made or permitted to be made statements with regard to the European recapitalization and SWN that are misleading for both reasons, i. e., they did not describe the facts accurately and they did not reveal

sufficient data. Regardless of which type of misrepresentation is involved, the statements (or facts omitted) must be *materially* misleading. It has been consistently held in this Circuit that:

> "The test of materiality ' \* \* \* is whether a reasonable man would attach importance \* \* \* in determining his choice of action in the transaction in question. \* \* \*' List v. Fashion Park, Inc., 2 Cir. *supra,* at 340 F.2d [457] 462; SEC v. Texas Gulf Sulphur Co., *supra,* at 401 F.2d 849; i. e., *a material fact is one ' \* \* \* which in reasonable and objective contemplation might affect the value of the corporation's stock or securities.* \* \* \*' Kohler v. Kohler Co., 319 F.2d 634, 642 (7 Cir. 1963); List v. Fashion Park, Inc., *supra,* at 340 F.2d 462; SEC v. Texas Gulf Sulphur Co., *supra,* at 401 F.2d 849. See also Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970)." Chasins v. Smith, Barney & Co., 438 F.2d 1167, 1171 (2d Cir. 1970) (emphasis added).

Thus, the Court must make a two-prolonged analysis; first, were the statements misleading, and second, if they were misleading, were they materially misleading?

With respect to the European recapitalization, or, as sometimes referred to, the "European transfer", what *facts* are alleged as having been omitted in various press releases as set forth in the Government's bill of particulars? Failure (1) "to disclose the planned transfer of the control and portion of the equity of a majority of ECO's European subsidiaries away from ECO and the steps that had been taken to effect the transfer" (August 3, 1971 release); (2) to disclose "the planned European transfer and the steps that had been taken to effect the transfer" (August 27, 1971 release); (3) to disclose "the European transfer" (September 17, 1971 release); (4) "to disclose" or "to disclose and describe" the European transfer (releases of September 27, October 15, 18, 22, November 2, 8, 15, 1971); and (5) to dis-

close, while describing "international operations", the "transfer of the voting control and a portion of the equity of a majority of these operations" (release of November 16, 1971). (Bill of Particulars, ¶¶ 47A, B, C, D, G, H, I, J, K, L and M).

Turning to the various letters to stockholders, what are the facts allegedly omitted? (1) Failure to disclose "the European transfer and the deliberations thereon by ECO's Board of Directors" (Letter of September 27, 1971); (2) failure to disclose "the European transfer" (Letter of November 16, 1971); (3) falsely describing "the European transfer and the reasons therefor" (Letter of November 29, 1971); (4) failure to disclose the reasons and circumstances of the return by DeFranceschini of "all voting rights to the foreign subsidiaries" (Letter of November 29, 1971); (5) although stating "that the Board of Directors of ECO's two Swiss companies involved in the European transactions had conducted detailed independent accounting and legal reviews of the transactions and concluded no diminution of assets had or has occurred" and further stating that "the five man-boards are composed of three Swiss citizens, who are not employees of ECO, and DeFranceschini and Koenig, the letter failed to disclose that the three Swiss citizens were employed by ECO as attorneys and auditors and were themselves involved in the transactions" (Letter of November 29, 1971); and (6) failure to disclose "that among the 'certain actions by ECO' necessary to be completed before the Union Bank settlement would be effective was the placing of the securities through which Koenig and DeFranceschini exercised voting control over Usuelli, BFT–SA, Sella and Gallieni in escrow" (Letter of February 23, 1972). (Bill of Particulars, ¶¶ 47E, N, O and P).

In order to determine whether the information disseminated regarding the European transfer or recapitalization was materially misleading, and with a view to a determination of whether a de-

fendant acted with the requisite *scienter,* whether there was an appropriation of ECO's assets, and whether the alleged fraudulent activities were in connection with the purchase or sale of securities, it is necessary once again to review what actually happened in 1971; that is, what was planned and carried out and the reasons therefor, what was concealed, if anything, and what was material under the then existing circumstances and conditions.

The nature of the various recapitalizations of the three Italian subsidiaries, the creation of the Italian partnership, and the acquisition of the Lichtenstein Anstalt have been described in some detail *supra.* Essentially what was done was to transfer voting control of Usuelli, Gallieni and Sella from ECO's wholly owned Swiss subsidiary ESSA to an Italian partnership, Ecological Engineering SAS ("ECO–SAS") of which Koenig was general partner and 1% owner and Brown Fintube S.A. ("BFT(S)"), a Swiss corporation wholly owned by a wholly owned subsidiary of ECO, was limited partner and 99% owner, and thereafter to transfer such control to a Lichtenstein Anstalt, Steinteil Handels Anstalt ("SHA"), ownership of which was evidenced by a bearer certificate held by either Spiess or DeFranceschini on behalf of ESSA. The actions taken to effect the foregoing commencing in June 1971 and extending into the following year included the formation of the Italian partnership ECO–SAS and the Lichtenstein Anstalt SHA, the recapitalization of certain subsidiaries by authorizing additional stock and a new class of voting stock, by changing the voting rights of previously issued stock, by having the new stock subscribed by certain subsidiaries and the partnership, and by certain subsequent intra-company sales.

It is unequivocally clear from the evidence that *the original purpose of the Italian partnership ECO–SAS had nothing to do with voting control over any subsidiaries; rather, it was formed to handle certain new engineering and ecology services in Italy.* Claudio Camilli, of the firm of Baker & McKenzie, ECO's European counsel, after consultation with DeFranceschini and other tax counsel, decided that by using a partnership in which the limited partner was a non-Italian corporation, *i. e.,* BFT(S) (a Swiss corporation), and the unlimited partner an individual non-Italian, *i. e.,* Koenig, there would be *a substantial saving in Italian taxes.* This decision was reached early in January or February 1971, long before any demand by ECO's creditors that Koenig resign. Indeed, in March 1971 Camilli forwarded to Koenig a special power of attorney to effect the creation of ECO–SAS although it was then undecided whether ESSA or BFT(S) would be the limited partner. However, by the end of May 1971 Camilli and DeFranceschini were made aware by Koenig of the developing problems of ECO in the United States, including its dispute with its auditors, the consent decree and the suspension of its stock from trading, and the difficulties arising with its creditors by reason of the delay in the completion of the 1970 financial statement. Of principal concern, also, was the fact that in November 1971 almost $2 million would be due from ESSA as the balance of the purchase price for Sella, a debt which was secured by stock of Sella.

Faced with the prospect of losing working capital lines of credit for the Italian operating subsidiaries and possible forfeiture of the Sella stock, Koenig in mid-June 1971 met in Europe with DeFranceschini, Camilli, Giangiorgio Spiess, an attorney and director of ESSA, *to devise a method to keep the subsidiaries operating and functioning.* This was extremely important to ECO since those subsidiaries produced about half of ECO's income and a substantial part of its revenue in 1969 and 1970. *It is clear that Koenig did not propose any plan which would perpetuate his position.* In the first place, the Italian banks had advanced money on a demand basis in reliance on DeFranceschini, more than on Koenig, and upon the ex-

cellent results of the Italian subsidiaries under ECO ownership. These banks were fearful that the money they were lending to the subsidiaries to be used as working capital might find its way to ECO rather than be used for its intended purpose. In addition, there was the possibility that a creditor of ECO would try to become a creditor of ESSA by attaching a loan from ESSA to ECO. ESSA had become the weak link in the European chain of operations because of the deteriorating situation in the United States, and it was important to insure that the flow of funds to ESSA for use in meeting the liabilities of or extending the investment in the Italian operating companies which it controlled did not "lead" back to ECO or its creditors.

It is important to recognize that possible solutions available under the laws and practices of the United States were not recognized or available under Italian or European law. One of the many things overlooked in this case is that the steps taken were done to conform with the law and business practices in the countries in which they were effected. Koenig suggested various alternatives such as the pledging of assets or the execution of management contracts which would not have required the recapitalization which, the Government alleges, resulted in a transfer of control or equity to him personally. All of these suggestions were rejected as infeasible under Italian law or business practices. After much discussion of alternative courses of action, including the use of partnerships, it was generally agreed that the best solution to the ESSA problem was to recapitalize the operating subsidiaries and place them under the control of a partnership. The details of the plan were not worked out and the ultimate solution was left to Camilli and Spiess who were to determine if there were any unforeseen problems under the laws of Italy and Switzerland.

In addition, after reviewing the financial structure of ECO's European operation, it was decided that the contractual relationship between ESSA and Sella, described *supra*, would be discontinued in favor of the previous relationship whereby Sella invoiced directly to its own customers and ESSA was merely a holding company.

Furthermore, ESSA at that time held a considerable amount of receivables from foreign companies and a considerable amount of payables, mostly due to suppliers of raw materials and Sella. Accordingly, it was decided to assign both receivables and payables to BFT(S) in order to make sure that the money which was collected would be used for the purpose of paying suppliers and Sella.

Little purpose would be served by repeating the description of the transactions effected in Europe over the summer of 1971. The uncontroverted trial evidence elicited from Camilli, the only Government witness testifying to these transactions, permits only the following conclusions: *that every action that Koenig and DeFranceschini took in Europe was in the name of and for the benefit of ECO, that nothing of substance regarding ECO's equity in its European operations was planned or occurred, and that the assets and control of the foreign companies always had remained in ECO and its shareholders. This was confirmed by independent auditors.*

The same persons, *i. e.*, DeFranceschini, Koenig, and the other three directors, continued to vote the shares of Sella, Gallieni and Usuelli held by ESSA both before and after the recapitalization. After the substantial completion of the recapitalization at the end of September 1971 DeFranceschini and Koenig voted the shares of the three Italian subsidiaries which BFT(S) and SHA then held. Spiess and/or DeFranceschini continuously held the bearer certificate of SHA on behalf of ESSA as directors and fiduciaries. Indeed, SHA is still in existence, continues to control BFT(S), and performs financial services for ECO's European subsidiaries. Furthermore, the creation of ECO–SAS did not alter the existing managerial structure of the Italian oper-

ating companies, *i. e.,* Koenig, through DeFranceschini, exercised ECO's control of the day-to-day operations of Usuelli, Gallieni and Sella. Similarly, Koenig's giving of his proxy to DeFranceschini to exercise the function of the general partner of ECO–SAS merely expressed the existing relationship in a different manner.

There was no attempt made to conceal what was done. The defendants, and other members of ECO's board, merely exhibited an understandable caution not to release information to the general public until sufficient details were known. On September 8, 1971 ECO's Board of Directors was formally advised regarding the proposed and partially completed transfer of voting control. There is no evidence that at that time Koenig had any knowledge of the details of the transactions, since he had not been in Europe since the meetings in June and relied on DeFranceschini to tell the Board about the steps that were being taken in Europe to protect the lines of credit and to insure the continuing viability of the Italian subsidiaries. Nor does the evidence show that Koenig withheld from the Board any information regarding the recapitalization. Camilli did not furnish Koenig with the various resolutions and paper work until early October 1971.

Moreover, the actions taken by Koenig were pursuant to established authority Koenig had previously followed regarding such matters, as in the 1970 "recapitalization" of ESSA which he completed without detailed prior clearance by the full ECO Board. He indicated to the Board that everything that had been done could be easily undone if the Board did not approve. He reported promptly to ECO's special counsel, and testified before the SEC on September 16 and 21 regarding the recapitalization. The Publicity Committee was working on a letter to ECO's stockholders in early November 1971—before the SEC lawsuit— which letter contained a comprehensive description of the purpose and mechanics of the recapitalization. The letter

was not sent because the SEC action intervened. In short, equity ownership or assets in the Italian subsidiaries were not transferred out of ECO or the ECO "family"; the matter was presented to ECO's Board for ratification, if ratification was required, and the matter was tabled until unanimously ratified on January 8, 1972; the transactions were made known to ECO's SEC counsel, to the SEC, and to ECO's creditors.

Turning now to the question of whether the facts disclosed regarding the European recapitalization were materially misleading or whether material facts were not disclosed, the Court would first note that the Government's allegations regarding the press releases and the letters to shareholders charge either a failure to disclose the recapitalization at all or a failure to disclose material facts which rendered the statements made about the recapitalization misleading.

■ Insofar as the Government's allegations charge that the defendants failed to disclose that voting control over, or that a portion of the equity of, ECO's Italian subsidiaries was appropriated by Koenig and/or DeFranceschini for their own benefit or in an attempt to maintain Koenig in power, the Court must regard those allegations as wholly without any basis in the evidence. The evidence clearly establishes that the recapitalization was effected for legitimate business reasons and that control of the subsidiaries, and the equity therein, was always in the hands of ECO. Accordingly, the defendants can hardly be charged with failure to disclose information which was not true.

■ The fact remains, however, that the accomplishing of the recapitalization and the details of the transactions involved were not disclosed prior to September 8, 1971. This does not, however, necessarily lead to a conclusion that § 10(b) or Rule 10b–5 have been violated. In the first place, the Second Circuit has indicated that a corporation possesses a

certain degree of discretion in timing the release of material information.

"We do not suggest that material facts must be disclosed immediately; the timing of disclosure is a matter for the business judgment of the corporate officers entrusted with the management of the corporation within the affirmative disclosure requirements promulgated by the exchanges and by the SEC. Here, a valuable corporate purpose was served by delaying the publication of the [material information]." SEC v. Texas Gulf Sulphur Co., *supra*, 401 F.2d at 850 n. 12.

Assuming, *arguendo*, that the recapitalization was a material fact, there is evidence in this case which, the Court believes, establishes that a genuine corporate interest was served by delaying the announcement that the recapitalization was planned; *viz*, Koenig and his European colleagues were interested in keeping their options open with regard to solving the European financial situation and did not want to commit themselves to a complicated recapitalization plan unless it was necessary. Indeed, the initial recapitalization was not effected until August 31, 1971, only eight days prior to the ECO Board meeting at which the recapitalization was revealed.

 Notwithstanding this legitimate interest in delaying the disclosure of the recapitalization plan, the Government's case on these counts is defective for an even more basic reason. There can be no violation of § 10(b) or Rule 10b–5 unless the information withheld was material. As stated *supra*, the test of materiality is whether the information withheld is of such a nature that a reasonable man would attach importance to it in making an investment decision. As the Court has already indicated several times, the recapitalization was a mere change in the corporate form of ECO—it was not a change of substance. Voting control did not pass out of the hands of ECO. It was exercised, as it had been before the recapitalization, by

Koenig and DeFranceschini as fiduciaries of ECO. The recapitalization did not diminish ECO's equity interest in the subsidiaries. The bearer certificate of SHA—which was at the pinnacle of the new corporate structure—was held continuously by either Spiess or DeFranceschini *solely for the benefit of, and as fiduciaries of, ESSA*. The Court simply cannot conclude that such a change in the corporate structure of ECO, as complicated as it was, could affect the investment decision of a reasonable man, particularly in the light of the depressed, if not non-existent, market in ECO securities.

 Furthermore, since the recapitalization itself was not a material fact, such details of the transaction as the exact nature of the ECO Board's deliberations, the identity of the Swiss lawyers, etc.—the non-disclosure of which the Government claims rendered the press releases and stockholders letters misleading—are also, *a fortiori*, not misleading. In short, any claims that the defendants violated § 10(b) or Rule 10b–5 with regard to the European recapitalization must fail because of the immaterial nature of the transaction.

 Faced with proof that no substantive change in assets, financial condition or control of ECO or its foreign subsidiaries ever really occurred, the Government now argues that Koenig received the "indicia" of control and ownership, and that there was an illicit purpose to the transaction. It is conceded that had Koenig and DeFranceschini stolen the assets of ECO's foreign subsidiaries or had seized personal control of those companies, the test of materiality would be satisfied. *Cf.* United States v. Simon, 425 F.2d 796 (2d Cir. 1969), cert. denied, 397 U.S. 1006, 90 S.Ct. 1235, 25 L.Ed.2d 420 (1970). The Court, however, has already indicated that the assets and control had always remained in ECO and its shareholders, and neither Koenig nor DeFranceschini received a penny of the earnings or property of the subsidiaries.

The Government, in support of its "indicia of control" theory, relies solely on the *appearance* of what Koenig *might* have done in an effort to portray what was done as a material fact. It asserts that as a result of the shift of voting control, Koenig and DeFranceschini thereby obtained the *apparent* authority to sell the assets of the company, and that, therefore, they misappropriated those assets. It has been established, however, that Koenig and DeFranceschini had the exact same power and authority with respect to the Italian subsidiaries before the recapitalization as they did after its completion. In both instances, the only restriction on their ability and apparent authority to sell or dispose of such assets was their fiduciary obligation to ECO and its subsidiaries, which the Government does not claim was ever abused in any way. Since the recapitalization did not change Koenig's and DeFranceschini's "indicia of control" or their potential to abuse their trust, the recapitalization did not result in new material information which had to be disclosed.

■ To argue that Koenig merely did not have authority to do what he did without prior Board approval does not make out a claim under Rule 10b–5 since there must be some showing of deception or fraud and not just a showing of corporate mismanagement. *See, e. g.,* Schoenbaum v. Firstbrook, 2 Cir., 405 F.2d 200, rev'd en banc, 405 F.2d 215, 219–220 (2d Cir. 1968). The Court has already held that the recapitalization was effected for legitimate business reasons, that there was no misappropriation of corporate assets and, hence, no scheme to defraud, and, finally, that Koenig revealed to the Board all he knew of the recapitalization at the September 8 and 16 board meetings. Accordingly, such cases as United States v. Mackay, 491 F.2d 616 (10th Cir. 1973), and United States v. Simon, *supra,* 425 F.2d 796— cited by the Government in support of its position—are inapposite because they involved schemes to gain control of a corporation by using its assets or to use corporate assets in order to pay off personal debts, and there is no evidence of such a scheme in the instant case.

■ Furthermore, the evidence will not even support a claim of mismanagement or breach of fiduciary duty on Koenig's part. There is a complete absence of evidence that the recapitalization was an *ultra vires* act, that the arrangement was unfair to ECO stockholders, that ECO's Board lacked authority to approve the arrangement, or that it was one calling for shareholder approval. Moreover, ratification and approval was tabled by the Board of Directors on September 8 and again on September 16, 1971. Accordingly, the recapitalization, even assuming it involved a substantive change in control, had no binding legal effect until the Board ratified and approved it, which was done on January 8, 1972. Of course, in the meantime the SEC had commenced the action against ECO, ECO–SAS, SHA, Koenig and DeFranceschini.

■ Nor is the Government's suggestion that the recapitalization was material because it had an immediate illegal purpose at all impressive. According to the Government, Koenig's purpose was to defraud Union Bank and other creditors and thereby insure his "indispensability" to ECO. But Union Bank had voiced no threats to Koenig's incumbency as of June 16, 1971 when the recapitalization was first discussed, and it is clear that Koenig, DeFranceschini, and other members of the ECO "family" in Europe proposed and implemented the plan because of the threats to the survival of the foreign companies which were emanating from the Italian banks who were threatening to call their loans and withdraw their lines of credit. Indeed, the banks did call their loans in July, before the recapitalization could be put into effect.

■ There is no evidence that the transaction constituted an actual or attempted fraud on Union Bank. The transaction was not prohibited by the Union Bank credit agreements, and Un-

ion Bank had no security interest in the assets of the subsidiaries involved. Nor has it been suggested that Union Bank or any other creditor would have been directly or indirectly prevented by the recapitalization from levying upon the assets, property or income of the foreign subsidiaries. It is undisputed that the recapitalization and all the steps taken to effectuate it were completely legal under Italian and Swiss law, and the Government has not introduced any evidence as to the legality or illegality of the transaction under the laws of Florida. An evil intent is not sufficient to transform a case of corporate mismanagement into a securities fraud case unless accompanied by fraud or deceit. *Cf.* Lester v. Preco Industries, Inc., 282 F. Supp. 459, 462 (S.D.N.Y.1965).

Even if the Government's speculation as to the ultimate purpose of the transaction were correct, there is not a shred of evidence that Koenig ever attempted to carry out his plan. Never once did Koenig or anyone else say, hint or imply, by action or deed, to Union Bank or any other creditor that if they did not drop their threats to his control of ECO he would prevent them from levying upon the assets of the foreign companies.

█ Assuming for the moment that the "indicia" or appearances of matters, whether material or not, must be disclosed the evidence shows that Koenig did not willfully conceal or misrepresent anything. As information was received further details were furnished. What the Government attacks in the releases, letters to stockholders, and filings which relate to the recapitalization is the failure to admit illegality. Such a premise is completely unsupported and therefore the Government's major disclosure arguments must fail.

█ Krantz' connection with the recapitalization was nebulous and peripheral, as was Mulligan's. The first information which either had about a European recapitalization was in the course of a meeting with DeFranceschini in a bar at the New York Hilton on August 17, 1971. At that meeting DeFranceschini described the plan in broad terms, indicating only that a plan had been worked out with the banks and European counsel although not yet executed, and that it involved voting the stock, but that they were already voting the stock. The next time Krantz or Mulligan heard about the recapitalization was at the Board meeting on September 8, 1971 at which time Krantz moved to table ratification or approval of what had been done until the Board was in possession of an opinion from Camilli and further information.

Reeves, of course, had no connection with the recapitalization, except to urge that any oral understanding between Koenig and DeFranceschini be reduced to writing. He did not enter the picture until September 9, 1971. What is charged against Krantz, Mulligan and Reeves is that they (1) attempted to conceal the full facts about the recapitalization, and (2) participated in the issuance of reports or other material which omitted to state that what Koenig and DeFranceschini had done was illegal. The evidence does not support any charge of concealment since there is no evidence that Krantz, Mulligan or Reeves knew any more about the recapitalization than was revealed at the September Board meetings. The Government's charge that DeFranceschini revealed the details of the recapitalization to Krantz and Mulligan in August 1971 is not supported by the record. The only evidence adduced as to that meeting is that DeFranceschini described the plan in .very broad terms and that he further described it only as a possible course of action. Indeed, Camilli testified that he was not even sure that DeFranceschini met with Mulligan in August 1971. Finally, it is the Court's opinion that Krantz and Mulligan acted reasonably in moving and voting to table ratification of recapitalization until the details of the transactions and their legality could be ascertained. They were not compelled by law or common sense to

disseminate incomplete and possibly inaccurate information.

It therefore would appear that there was neither a misrepresentation of nor a failure to disclose material facts with respect to the recapitalization, nor a misappropriation of ECO's assets. Even assuming, *arguendo*, that there was a material misrepresentation, it would still be necessary to find that a particular defendant acted with the requisite *scienter*. However, before discussing the issue of *scienter*, the Court will proceed to a determination of the issue of whether a material misrepresentation or omission occurred in connection with the SWN project, and, more particularly, in the letter to stockholders of September 27, 1971.

The Government has charged that the letter of September 27, 1971 was criminally false and misleading because it failed to disclose that (1) SWN was an undercapitalized "shell" corporation which had no assets or employees; (2) the president of SWN, Ross Bohannon, was performing other services for ECO, for which he was receiving cash advances to cover his expenses only; and (3) defendant Mulligan was a promoter of the project.

As has already been noted, falsity of the information in the letter is not charged, rather the Government claims that additional information should have been included in the letter without which the information contained therein was misleading. Before discussing the letter of September 27, reference must be made to the meeting at Union Bank on June 29, 1971 and to the background of the project which became incorrectly known as the "Southwest" Nuclear project. Despite the Government's inferences to the contrary, the nuclear power plant project was not a brainchild of Koenig or of any of the defendants nor was it conceived for the purpose of maintaining Koenig in office. Mulligan had previously met Ross Bohannon in connection with a monorail project in Las Vegas, and heard about the nuclear project in early 1971. In view of the ecological consideration involved in a nuclear power plant project, Mulligan introduced Bohannon to Koenig.

At the June 29, 1971 meeting with Union Bank, Koenig read from a letter dated June 28, 1971 which he had sent to Union Bank disclosing the award to ECO subsidiaries Ecological Engineering, Inc. and Rader & Associates, Inc. of a major new ecological project, *i. e.*, preparation of a *feasibility* study of a $300 million atomic energy power plant in the western United States. The release as authorized by the "group awarding this contract" goes on to state that if the feasibility study supports the project, ECO will be designated to engineer the project, and to select the designers, suppliers, contractors, and operators. It further states that "the present developers of this project are well known to Union Bank" and that the award was "contingent on the present management of Eco continuing."

The Government contends the announcement was misleading since it did not state that a contract had not as yet been signed, that a determination that the site was suitable had not as yet been made, and that it should have been stated that the group awarding the contract included Mulligan and Bohannon. It is true, as will be seen, that the contract was not signed until some weeks later and that the company to represent the "group" had not as yet been formed on June 29, 1971. There is no evidence that any statements were actually false —*e. g.*, that Union Bank, to whom the letter was directed, did not know the developers. Furthermore, all that ECO's subsidiaries had been "awarded" was a *feasibility* study, not a construction or management or operating contract. The project having been "awarded" to ECO's subsidiaries, the promoting group was incorporated on July 16, 1971 as "Northwest Nuclear, Inc.", the name Southwest Nuclear being unavailable, and a contract was signed on July 31, 1971.

It must be noted that neither the indictment nor the bills of particulars anywhere suggest that the June 29 meeting

or the SWN announcement constituted a violation of any statute or rule or the consent decree; nor do they suggest that the meeting was a means of the alleged conspiracy. Furthermore, Union Bank made no decisions having anything to do with the statements about the nuclear project.

There is nothing surprising in the fact that the agreement was to be contingent upon present management continuing in office, nor could this have affected Union Bank, since all ECO's contracts with the bank contained such a provision. The suggestion that certain of the subsidiaries, *including Rader*, were misled by the announcement about the nuclear project and withheld rescission of their acquisition of ECO stock by reason thereof, is not only absurd, but unsupported by the record. Nothing that transpired at the meeting violated federal law, or state law so far as has been alleged.

We pass now to the letter of September 27, 1971. It should be repeated that neither the indictment nor the bills of particulars make any claim that any of the information contained in this letter was false or misleading. The only charge is that certain additional information should have been furnished without which the information contained in the letter was misleading.

■■■ It is claimed that the letter failed to disclose that Southwest Nuclear was an undercapitalized "shell" corporation which had no assets or employees. In the first place, the Government has failed to prove that on September 27, 1971 SWN was an undercapitalized "shell" corporation with no assets or employees, and has only shown its condition at the time of incorporation over two months earlier. Neither Ross Bohannon, a promoter of the project, nor Earl Rader, who headed the feasibility study, culminating in the Rader report dated September 15, 1971, finding the project feasible from both an engineering and economic standpoint, were called as witnesses. Furthermore, the capitalization of SWN on September 27, 1971 was not material insofar as ECO was concerned and there is no proof that any of the defendants knew on that date that the $150,000 fee for the study would not be paid—indeed, Krantz had obtained assurance from Rader that the fee would be paid.

■■■ The Government further claims that Bohannon, the president of SWN, was performing other services for ECO for which he was receiving cash advances to cover his expenses and that this was not disclosed in the letter. This claim is accurate but there has been no showing that these services were in any way related to the nuclear project or that they created any conflict of interest. Bohannon had also been working on the possible sale of ECO's utilities to one John MacArthur, an individual of great wealth and with whom Bohannon had a close relationship, and this, of course, was known to ECO. Indeed the mention of Bohannon's name in the letter could have been misleading by inferring MacArthur's interest in the project, which interest has not been shown. The reimbursement of Bohannon's expenses, amounting to $8,000, was not material.

■■■ The Government further charges that the letter did not reveal that Mulligan was a promoter of the project and that that was a misleading omission. However, that was not a fact —since the record is totally devoid of any evidence establishing Mulligan as a promoter of the project.

■■■ The Government also appears to claim, with reference to the September 27, 1971 letter, that the characterization of the award of the $150,000 preliminary study to ECO's subsidiaries as "the most noteworthy single event in Ecological Sciences recent history" was objectionable. But one has only to read the contemporaneous press releases and letters to stockholders to appreciate that this was not a time of good news, for the stockholders and the public were being furnished with a picture of economic disaster where the award of any

contract would be good news. Indeed, in the very same envelope with the SWN letter was a second letter to shareholders announcing a net loss of $220,000 for the first six months of 1971, revenues of $28,000,000 for the same period, a negative working capital of almost $9,000,000 and ECO's default on several substantial loans and a third letter announcing that Union Bank was suing ECO for over $13,000,000. The information contained in those letters, taken together with the otherwise well known economically depressed nature of ECO finances and the fact that trading of ECO stock had been suspended, renders the Government's claim that the information allegedly omitted from the SWN letter was material almost ludicrous. This Court cannot, upon the state of facts adduced by the evidence, conclude that this was information which could affect the investment decision of a reasonable investor.

Accordingly, on the basis of the evidence presented by the Government in this criminal case, the letter of September 27, 1971 relating to the SWN project was not in violation of Rule 10b–5 insofar as its contents are concerned. Moreover, even if the letter did violate Rule 10b–5—and this is contrary to the evidence—one must ask what criminal connection has been shown between the letter and the defendants herein, or, in other words, which of the defendants participated in the issuance of the letter with actual or imputed knowledge that the letter contained fatal omissions.

Koenig's participation in the issuance of the letter is not disputed, but assuming that the size and activities of SWN was a material fact, the Government has failed to introduce evidence sufficient to show that Koenig or any of the other defendants had any knowledge of those facts on September 27, 1971. The only evidence linking Mulligan to this letter was Downs' testimony that on or about September 16, 1971 Koenig told Downs that Mulligan was a member of the publicity committee. Mulligan testified before the SEC and Grand Jury that he did not assist in the preparation of the letter. Sibal, Treadway, Adolph and Krantz were the members of the publicity committee from its inception through September 16, 1971. At that time, Sibal and Treadway were discharged and, as of September 17, 1971, the committee consisted of just Krantz, Adolph, and possibly Downs with review authority in Chotiner and Reeves as outside counsel. Downs was unable to specify a single press release or communication to stockholders that he had ever discussed with Mulligan. Moreover, not one of the distribution lists of various drafts of memoranda about publicity releases names Mulligan as a recipient.

Although Mulligan was present at the meeting with Union Bank on June 29, 1971, there is no evidence that he knew of any falsehoods in Koenig's statements to Union Bank or that they were in fact falsehoods. Neither had he any duty to ask Koenig for additional facts absent a showing that he knew something was amiss. As to the statements made by the subsidiary heads in support of Koenig's indispensability, there was no proof that the statements were not true or not believed by those who made them, except for one doubtful case which bore no relation to Mulligan. Moreover, it must be reiterated that nothing that transpired at this meeting violated federal law. The Government has made various charges in its brief relating to the SWN project and the execution of the contract for that project on July 30 and 31, 1971. But no matter what view of the evidence relating to those meetings is taken, no federal law was violated, nor does the Government charge any violation in the indictment which is proved by the evidence relating to these meetings. Indeed the perjury count was dismissed at the close of the Government's case for failure of proof.

With respect to Krantz, the record does not show that he participated in ECO's dealings with SWN or that he had anything to do with SWN, the project, the contract, or the feasibility study. There is no evidence that Krantz knew that SWN was being promoted by Mulli-

gan (if that was the case) ; that Bohannon was a paid attorney and consultant for ECO (if he was) ; or that SWN was "a shell corporation without assets or employees" on September 27, 1971 (if that was the case). Although there is evidence that Koenig spoke with Krantz about the proposed letter on the telephone around September 20–22, 1971, at which time Krantz insisted on the disclosure of the $150,000 contract price and assurance that it would be paid, there is no evidence that he ever saw the final draft before it was sent and, indeed, the evidence shows that he did not even know if it had been sent. As for the June 29 meeting, even if material misrepresentations were made regarding the nuclear project, and this has not been established, there is no evidence that he knew, or had reason to know, of such misrepresentations.

■■■ Reeves, who did not enter the ECO picture until September 1971, did not see the SWN letter of September 27, 1971 until after it had been sent out. Nothing in the record sustains the charge that Reeves knowingly and willfully tried to mislead anyone with respect to the SWN project.

One further comment is necessary. Although it is charged as one of the means of the conspiracy that the misrepresentations or omissions relative to the SWN project were for the purpose of (a) deceiving the creditors who were considering the removal of Koenig as chief operating officer and (b) deceiving the stockholders into supporting the management headed by Koenig, no mention was made in the letter of September 27, 1971 to the stockholders (as was made at the meeting with Union Bank on June 29, 1971) that the contract with SWN required the continuance of present management—a strange omission in view of the Government's charges. As for Union Bank, it obviously was not influenced by the June 29 statement.

Accordingly, the Court finds that a reasonable mind could *not* fairly conclude beyond a reasonable doubt: (a)

that there was a misrepresentation or failure to disclose *material* facts in the letter of September 27, 1971 to the stockholders of ECO relating to the SWN project. However, assuming *arguendo* that there was a material misrepresentation, it would still be necessary to find that a particular defendant acted with the requisite *scienter*. This question of *scienter* is relevant not only to the § 10(b) and Rule 10b–5 violations, but to the conspiracy count and to the remaining substantive counts.

■■■ Thus, the Court comes to the question of criminal intent. The "willfulness" requirement of § 32(a) of the Exchange Act does not require the Government to prove specific intent to violate the act. *See, e. g.*, United States v. Schwartz, 464 F.2d 499, 509 (2d Cir.), cert. denied, 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1972). The Government must, however, prove an intent to commit the act which constitutes a violation of that section of the statute under which the defendant is charged. Since § 10(b) and Rule 10b–5 essentially prohibit fraud in connection with the purchase or sale of securities, the question before the Court is whether specific intent to defraud is necessary to establish a criminal violation of those sections.

The Court can find but one case which requires a specific intent to defraud—United States v. Piepgrass, 425 F.2d 194, 199 (9th Cir. 1970). All of the other cases which the Court has examined involving criminal prosecutions of § 10(b) or § 17 of the Securities Act (which may be regarded as equivalent to § 10(b) for the purposes of intent), including those cases decided by the Second Circuit, do not identify the intent element as a specific intent to defraud. Rather, they resolve the question of intent by looking to either the actual knowledge of the facts that the defendants possessed or the knowledge of the facts that the defendants should have possessed. In other words, did the defendants actually know that the representations were misleading or that material facts were omitted, or did they will-

fully disregard the truth or completeness of the facts represented? *See, e. g.,* United States v. Henderson, 446 F.2d 960, 966 (8th Cir.), cert. denied, 404 U. S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543 (1971); Elbel v. United States, 364 F.2d 127, 131–132 (10th Cir. 1966), cert. denied, 385 U.S. 1014, 87 S.Ct. 726, 17 L. Ed.2d 550 (1967); United States v. Meyer, 359 F.2d 837, 839 (7th Cir.), cert. denied, 385 U.S. 837, 87 S.Ct. 85, 17 L.Ed.2d 71 (1966); United States v. Benjamin, 328 F.2d 854, 862 (2d Cir. 1964); United States v. Schaefer, 299 F.2d 625, 629 (7th Cir. 1962); United States v. Hill, 298 F.Supp. 1221, 1234 (D.Conn.1969).

■ Therefore, in the instant case, the Government must prove, in order to establish criminal intent, a defendant misrepresented or failed to disclose material facts, (a) *knowing* that the facts represented were false or that he failed to disclose material facts or (b) *not knowing* that the facts represented were false or that he failed to disclose material facts but acting with willful or reckless disregard for the truth or being under a duty to know of such falsity or failure to disclose. In this connection, defendants Krantz and Mulligan, as "outside" directors, argue that the holding in Lanza v. Drexel & Co., 479 F.2d 1277 (2d Cir. 1973) (en banc), is applicable to them and the Government argues that some special duty to know attaches to a defendant who is a lawyer.

■ Actually, *Lanza* does not necessarily expand, in the case of a director, what the Government must prove in order to show the necessary criminal intent, nor do the cases cited by the Government lessen these requirements in the case of a lawyer-defendant. *Lanza,* so far as it is pertinent to this case, holds that a director who does not participate in the preparation or dissemination of, or know of any misrepresentation or failure to disclose contained in, material disseminated by the corporation, does not have a *duty* to affirmatively insure that all material, adverse information is conveyed to third parties.

The Second Circuit clearly recognized, however, that knowing and substantial *participation* in such dissemination by an outside director would subject him to the same duty as any other participant. However, except in the case of an SEC civil enforcement suit seeking injunctive relief, mere negligence by a corporate officer or director would not appear sufficient to impose civil liability, and is certainly not sufficient to impose criminal liability.

■ With respect to the Government's claim of special status for an attorney, his duty is no different from that of the non-lawyer, at least in a criminal case, *i. e.,* he cannot plead lack of knowledge while acting with willful or reckless disregard for the truth. Mere negligence, however, will not suffice. SEC v. Spectrum, Ltd., 489 F.2d 535, 542 (2d Cir. 1973).

■ With these standards in mind, the Court turns to the question of whether the defendants knew of the falsity or incompleteness of any representation made with regard to the recapitalization or the SWN project. The answer to the question must be in the negative since the Court has already held that there were no such misrepresentations or omissions. There can be no doubt, therefore, that the defendants did not possess criminal intent to violate § 10(b) or Rule 10b–5.

■■ However, assuming *arguendo* that Koenig did indeed appropriate the Italian subsidiaries to his own benefit, did the Government adduce any proof that the remaining defendants had any knowledge of this? The answer must again be in the negative, since, as the Court indicated *supra,* Krantz, Mulligan and Reeves did not learn of the recapitalization until the September Board meetings (or, at the very most, that Krantz and Mulligan knew of the vague outlines of some contingent plan to restructure the Italian subsidiaries in mid-August). Assuming further, *arguendo,* that the revelations at the September Board meetings were materially

misleading in that the details of the recapitalization were not disclosed, did the Government adduce proof that any of the defendants, including Koenig, knew of such details? Again the answer must be in the negative since, as the Court has already found, the details of the transaction were left to DeFranceschini and ECO's European counsel and there is absolutely no evidence that precise information regarding those details was transmitted to any defendant prior to the September Board meetings.

With regard to the SWN project, assuming *arguendo* that the Government had sustained its allegation of misrepresentation, did the Government establish that any of the defendants had any knowledge that the deal was "phony"? As the Court has already indicated *supra*, there is absolutely no evidence to support such a finding.

The Government has also charged that Krantz, Mulligan and Reeves willfully disregarded, or "closed their eyes" to, facts which should have led them to believe that misrepresentations were made. Assuming, *arguendo*, that the representations in this case were false, but that these defendants were unaware of such falsity, did these defendants willfully disregard facts which indicated that the representations made were false? In this connection the Government speaks about "red flags" which should have alerted the defendants to the omission or falsification of material facts. But, as stated by the trial judge in *Lanza*, "[a]s in all lawsuits, we deal in the sometimes unreal certainties of hindsight", cited in Lanza v. Drexel & Co., *supra*, 479 F.2d at 1307. In the fluctuating illumination of hindsight, the colors of signal flags can change, depending upon where the observer stands. It seems clear that Koenig was impetuous and quick tempered, but there is no evidence that either he or DeFranceschini had ever in the past been an embezzler, or a converter of corporate assets to his own use and, therefore, that Krantz, Mulligan and Reeves should have been inherently suspicious of the recapitalization.

■ Assuming there was a tortious transfer of the European subsidiaries to Koenig and DeFranceschini, what "red flags" were there which Krantz, Mulligan or Reeves disregarded? What little information DeFranceschini disclosed to Krantz and Mulligan in August 1971 certainly did not constitute such a "red flag" and if what DeFranceschini reported to the Board on September 8, 1971 constituted a "red flag", it was so recognized when ratification was withheld until all the facts were known—and this was the status of the matter when Reeves appeared on the scene.

■■ Assuming that SWN was a "shell" corporation, what "red flags" does the Government charge Mulligan with disregarding? First, he knew the contract was conditional on the continuation of the present management of ECO. This, however, was a "green" flag, for why include such a provision in a contract with a bogus company? Furthermore, such a provision was standard in any number of other ECO contracts. Second, he saw Bohannon sign the signature page before the drafted contract was completed in final form, he did not see Bohannon make the $50,000 down payment, and he sat by when Bohannon introduced himself as president of SWN. In the first place, it is not unusual for signature pages to be signed prior to the completion of a document. No sinister inference need be drawn from such a practice. Furthermore, the Court does not understand the Government's implied argument that Mulligan was obligated to observe the payment called for by the contract—there is not even any evidence in the record showing that Mulligan was aware of this requirement. In addition, the Government has not adduced any proof that Mulligan had any reason not to believe that Bohannon was president of SWN. Finally, the court would note that under Lanza v. Drexel & Co., *supra*, 479 F.2d 1277, defendant Mulligan, as an outside director of ECO who did not participate in the preparation of the September 27 letter to

shareholders,[8] was entitled to rely upon ECO's management to make a full disclosure of all material information regarding the SWN project.

Thus, we come to the last two elements of the 10b–5 counts: (1) that there be purchases and sales of ECO securities at the time of the alleged fraud and (2) that those purchases and sales be in connection with the alleged fraudulent activities. Ordinarily, the Court would not discuss these elements since the Government has failed to sustain its burden with respect to the other requirements of 10b–5. Since, however, these elements were the subject of much debate both at trial and in the briefs accompanying the instant motions, the Court will briefly consider the merits of the parties' positions.

Although there are only two counts which charge a violation of § 10(b) and Rule 10b–5, the Government has, in essence, claimed that three separate categories of protected securities transactions occurred. First, the Government charges that the loans advanced and contemplated by various creditors (including Union Bank and Teachers) were securities within the meaning of the Exchange Act. It is true that the Act literally includes "any note", other than those which have a maturity at the time of issuance of less than nine months. 15 U.S.C. § 78c(a)(10). Furthermore, the Government is correct in its assertion that several courts seem to have literally interpreted that section. See, e. g., Sanders v. John Nuveen & Co., Inc., 463 F.2d 1075 (7th Cir.), cert. denied, 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1972); Movielab, Inc. v. Berkey Photo, Inc., 452 F.2d 662 (2d Cir.

1971); Rekant v. Desser, 425 F.2d 872 (5th Cir. 1970).

It is the Court's belief, however, that the better cases are those which have recognized context-over-text and have given effect to the proviso "unless the context otherwise requires . . ." which precedes § 78c(a). See, e. g., Lino v. City Investing Co., 487 F.2d 689 (3d Cir. 1973); McClure v. First National Bank of Lubbock, Texas, 352 F.Supp. 454 (N.D.Tex.1973). Those cases held that the note must evidence a loan which was given for investment purposes and not for ordinary commercial loan purposes, that the notes be given in situations where other securities would otherwise be appropriate, or that the notes be hypothecated, assigned, or negotiated. The notes and loans in question in the instant case do not possess these characteristics. They were ordinary commercial loans, some of them being given for the purpose of reducing ECO's cash flow deficit, which were not negotiable or assignable. Consequently, the Court would find such notes were not securities if it were necessary to reach that question.

Second, the Government contends, on the authority of such cases as Superintendant of Insurance v. Bankers Life & Cas. Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); United States v. Mackay, 491 F.2d 616 (10th Cir. 1973), and United States v. Simon, 425 F.2d 796 (2d Cir. 1969), cert. denied, 397 U. S. 1006, 90 S.Ct. 1235, 25 L.Ed.2d 420 (1970), that the recapitalization of the European subsidiaries involved trading in securities. The Court agrees that if Koenig and/or DeFrancescmni had ap-

---

8. Although the Court indicated *supra* that *all* of the evidence adduced by the Government would be considered in determining whether the defendants committed the substantive violations charged in the indictment, the Court must exclude the testimony of Downs—an alleged co-conspirator and member of the publicity committee at the time the September 27 letter was mailed to shareholders. His testimony that Koenig told him that Krantz and Mulligan approved of the SWN

letter is hearsay which can be admitted only if the Government has made out a *prima facie* case of conspiracy against the defendants. United States v. Geaney, 417 F.2d 1116, 1120 (2d Cir. 1969), cert. denied, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970). Since the record will not support such a charge, that portion of his testimony is not admissible and there is no other evidence linking Mulligan to the preparation of the September 27 letter.

propriated the subsidiaries then the transactions in those subsidiaries' stock would have met the purchase or sale requirement. Such misappropriation has not, however, been established in the instant case.

■ Finally, the Government contends that the "wash" sales effected by ECO shareholders for tax purposes meet the purchase or sale requirement. It will be remembered that during the entire period of time alleged in the indictment as encompassing the alleged conspiracy, with the exception of a two week period in August 1971, trading in ECO stock was suspended on all registered exchanges. The defendants contend that this suspension operates as a bar to any 10b–5 count because there could have been no purchases or sales of ECO stock. However, it is clear from *Bankers Life, supra,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128, that private face-to-face transactions are protected by Rule 10b–5: " . . . the fact that the transaction is not conducted through a securities exchange or an organized over-the-counter market is irrelevant to the coverage of § 10(b)." 404 U.S. at 10, 92 S.Ct. at 168. Thus, in Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), the Supreme Court upheld plaintiffs' § 10(b) claims in a face-to-face transaction.

The question becomes, thus, whether such wash sales are in connection with the alleged fraud. The Second Circuit, in SEC v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968) (en banc), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), specifically discussed this requirement and held as follows:

" . . . Rule 10b–5 is violated whenever assertions are made . . . in a manner reasonably calculated to influence the investing public . . . if such assertions are false or misleading or are so incomplete as to mislead . . . . . " 401 F.2d at 862.

The issue then is reduced to whether there was an investment community in ECO stock. Since Rule 10b–5 protects face-to-face transactions, and since the ban on trading did not prohibit face-to-face transactions, it would appear to the Court that the entire body of ECO shareholders represented an investment community which still retained the power to effect transactions in ECO stock and, thus, the ability to make an investment decision.

■ Of course, all of this is mere *dicta* since the Court has not found material misrepresentation or criminal intent. However, *the ban on trading in ECO stock is a highly relevant fact in determining the materiality of the alleged misrepresentations or omissions,* since if there were misrepresentations or omissions the investment community affected by them knew not only that ECO was beset by its creditors, at odds with the SEC, and on the verge of bankruptcy, but also that the stock which that community held or might wish to trade could only be traded privately. Considering the time and circumstances existing when the alleged misrepresentations or omissions occurred, it is difficult to imagine what a reasonable investor would have considered material information except an announcement that trading had been resumed.

Accordingly, the Court finds that the evidence adduced by the Government would not support a conclusion by a reasonable mind, beyond a reasonable doubt, that the defendants were guilty of the crimes charged in counts 2 and 3.

Before proceeding to an analysis of the remaining charges, it would be appropriate to review some of the press releases and letters to shareholders which the Government claims are either materially misleading or fail to disclose material information. These materials are not covered by the 10b–5 counts (counts 2 and 3) which, as the Court has already noted, involve only the European recapitalization and the SWN project. Rath-

er, they seem to fall within the conspiracy count as means of achieving the alleged 10b-5 object of the conspiracy. The discussion will be brief since many of these materials have been covered in the summary of facts and since the Court has concluded that, as to all of them, the Government has either failed to prove that there were misrepresentations or omissions or that the information allegedly misrepresented or omitted was material.

■ ■ *August 3, 1971 Press Release*—This item has been covered in some detail in the summary of facts, *supra*. In short, the Government has claimed that the release was misleading because (1) it failed to disclose that ECO was in default of its Union Bank loan agreements due to Teachers' refusal to fund its $4 million loan commitment and (2) it failed to indicate the amount of ECO's cash flow deficit. The Court has already concluded, *supra*, that by August 3, 1971 Union Bank had amended its loan agreements so as to cure any events of default then existing and waived as an event of default any failure by ECO to receive the Teachers' loan; that Teachers had not, in fact, refused to honor its $4 million loan commitment; that ECO was not required to specify its cash flow deficit in the press release and that in any event the amount of the cash flow deficit was specified three days later in the August 6, 1971 press release.

*August 19, 1971 Press Release*—The Government has charged that the omission of the so-called "40–40–20" agreement was materially misleading. Even assuming that the proportion was material (with which assumption the Court does not agree), the August 20, 1971 press release, issued the very next day, corrected the omission. *Cf.* Schy v. Susquehanna Corp., 419 F.2d 1112, 1117 (7th Cir.), cert. denied, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970); Abramson v. Nytronics, Inc., 312 F.Supp. 519, 524–525 (S.D.N.Y.1970).

■ *August 27, 1971 Press Release* —The Government claims, in very general terms, that this release did not accurately describe ECO's financial picture. The Court would merely note that this release, *when read together with other contemporaneous releases*, gave a fair and accurate description of ECO's financial problems. Apparently, it is the Government's position that every release during this period of time had to repeat the disastrous news contained in earlier releases. The Court holds that if a series of releases issued within a reasonably short period of time accurately disclosed the financial situation of the company, then the individual deficiencies of any one release are cured by the content of all the releases taken as a whole. Furthermore, the Court would note that the SEC, which was thoroughly knowledgeable of ECO's financial situation, cleared this release prior to its dissemination.

*September 17, 1971 Press Release*— The Government alleges that the release is false and misleading in that it failed to disclose the deliberations of the ECO Board, the circumstances behind the removal of Davidson and the installation of Koenig in his place as Chairman of the Board and the reasons for the resignation of Morris as a director. The Government has not, however, supplied any authority to this Court in support of its claim that such information is required to be disclosed. The Court can assume, however, that the Government is really seeking from the defendants an admission that the above enumerated events were the result of an illegal scheme—a scheme which this Court has found not to exist. Without such illegality, however, the events are clearly not material. Finally, the Government's claim that the release is misleading because it does not divulge that Union Bank was seeking the appointment of a temporary receiver in a lawsuit it had filed on September 16 must fail because there is no evidence in the record that the suit asked for such relief. Further-

more, the release of September 27 stated that Union Bank was seeking the appointment of a receiver, thus curing the deficiency of the September 17 release.

■ *September 27, 1971 Letter to Shareholders*—The Government repeats some of the allegations which were directed at the September 17 press release and, in addition, charges that the letter failed to disclose the Board's decision to make it more difficult to call a special shareholders' meeting. In the first place, there is no evidence that the Board's action was effective as of that date since Krantz' vote in favor was conditioned upon its legality under Florida law and there is no evidence indicating whether an opinion of counsel was ever received. Secondly, there is no evidence that the change required stockholder approval. Thirdly, the by-laws are available to any stockholder for inspection so that in any event the change in requirements was not concealed from the ECO shareholders. Furthermore, the Court does not believe that such information was likely to affect the investment decision of a reasonable investor. Finally, although the Government is correct in its assertion that the letter did not disclose that Union Bank had sued on its loans, the September 27 press release, mailed in the same package as the letter to shareholders, did in fact make such a disclosure.

■ *November 2, 1971 Press Release*—The Government claims that this release was false and misleading because, essentially, it announced a Florida court's decision to appoint a receiver for ECO's utility subsidiaries, and the company's position with respect to that decision, without disclosing the specific findings of the Court. The short answer to this charge is that the October 15 release fully disclosed the contentions of the plaintiff in that suit (the Florida Public Service Commission). The Government also alleges that the release was misleading because it did not disclose that the utilities were insolvent. It appears to the Court, however, that ECO

management had a legitimate reason for delaying such an announcement for approximately six days, *i. e.*, to prevent creditors from filing involuntary petitions in bankruptcy while ECO prepared a voluntary petition.

■ *November 8, 1971 Press Release*—The Government first charges that the release failed to disclose that the reason for filing a voluntary Chapter XI petition was to prevent the appointment of a state court receiver. In the first place, there is no evidence in the record which establishes any reason, including that asserted by the Government, for such action. Secondly, the Court does not find that the reason advanced by the Government, if disclosed, would affect the investment decision of a reasonable investor. The material facts were that the state court had ordered the appointment of a receiver and that ECO had filed the Chapter XI petition. Both of these facts were disclosed. The Government also alleges that the release failed to disclose the specific findings of fact made by the Florida court. However, there is absolutely no evidence that the opinion, which was filed only a week before, was in the possession of the defendants. Furthermore, in the light of the state court's order and the voluntary petition, this Court is at a loss to understand the Government's assertion that the omitted findings were material. Regardless of whether ECO's claims about the utilities were in conflict with the findings of the Florida court, the fact remains that the utilities were in serious financial trouble and the press release disclosed this state of affairs.

■ The Government also asserts that the characterization of ECO's cash flow as positive was false and misleading. However, the bills of particulars do not specify in what manner this statement was misleading and the Court cannot recall any testimony directed at this charge during the trial. Nevertheless, the Court assumes from the wording of the charge, that the Government's

position is that cash flow was negative at the time of the press release. The Court further assumes, from the expert accounting evidence presented at trial, that the Government's claim with respect to cash flow is the same as that with respect to working capital, i. e., that the positive figure results from the improper exclusion of the debt in litigation from the calculation of both figures.

The debt in litigation figure was excluded from the computation of working capital (and presumably from the computation of cash flow) because ECO had treated such debt as a contingent, rather than a current, liability. This determination was made, because it was estimated that the suits involving these debts would not be settled for at least two and possibly three years. The Government's expert accounting witness testified on direct examination that such debt should properly have been treated as a current liability. On cross examination, however, he admitted that pending litigation is often considered as a contingent liability. He further admitted that if an amount is not to be paid within one year that an accountant might regard that as other than a current liability, i. e., as a long term liability. He further admitted that he had not examined the complaints, answers and other papers underlying the litigation in question.

It appears to the Court from this expert testimony that, under "generally accepted accounting principles", the debt in litigation in issue in the instant case might legitimately be treated as either current, contingent or long term liability depending upon the consideration given to, *inter alia*, the merits of the suit and a realistic appraisal of when such debt would actually be paid. Such a determination could not be made without at least examining the papers upon which the suit is based. In any event, it could not be said that the Government's proof would sustain a finding beyond a reasonable doubt that the treatment of the debt in litigation in question was incorrect and, thus, was criminally misleading.

*November 16, 1971 Press Release and Letter to Shareholders*—In addition to claims that these materials were misleading with respect to the European recapitalization, the Government asserts that they contained misleading statements concerning positive working capital and the treatment of debt in litigation as long term liability. The Court has already determined that such a computation and treatment could be arrived at by employing "generally accepted principles of accounting".

*November 29, 1971 Letter to Shareholders*—The Government has charged that many, if not all, of the statements made in this letter with regard to the European recapitalization were false and misleading. The Court has already ruled against the Government on this issue with regard to the 10b–5 counts. The Government further claims that the letter falsely stated the time and circumstances under which ECO informed its auditors Haskins & Sells that Teachers refused to fund a loan commitment. Although the Court believes that there is conflicting testimony as to this issue, it is not necessary to resolve the issue since the Court agrees with defendants that the time at which this disclosure was made to Haskins & Sells simply is not material within the context of a letter to shareholders mailed four months after the event allegedly occurred.

*February 23, 1972 Letter to Shareholders*—The Government charges that the letter is false and misleading in that it refers to the Union Bank loans as short-term debt without disclosing that it was previously treated as long-term or contingent liability and that, although it discloses that some of the stock of the Italian subsidiaries will be security for a loan, it does not disclose that the shares will actually have to be held in escrow. It is the Court's opinion that these charges are representative of the

almost nit-picking level of much of the Government's case with respect to press-releases and letters to shareholders. In the first instance, neither of these alleged misstatements are material. Secondly, they are not even misleading. In the context of describing a settlement agreement, it was perfectly legitimate to refer to the loans as having been short-term (which loans, as the Court has already held, could have been legitimately treated as long-term while they were the subject of litigation) especially when the point being made was that the settlement converted them into seven-year notes. Furthermore, the letter stated that some of the stock of the Italian subsidiaries would serve as security for these loans. Surely, the failure to disclose the mechanics of the security agreement does not render the disclosure that a security agreement was entered into misleading—the essence of the agreement was that the stock was pledged as collateral, and that was disclosed.

*April 11, 1972 Letter to Shareholders* —The Government claims that this letter fails to properly disclose the terms of the settlement agreement with Union Bank. The Court merely notes that the terms of the agreement were disclosed in the February 23 letter and rejects the Government's apparent theory that repeated disclosure of significant events is required by the securities laws.

■ *May 15, 1972 and August 18, 1972 Letters to Shareholders and July 11, 1972 Press Release*—The Government charges that each of these communications is false and misleading in that they fail to accurately describe ECO's earnings and financial condition. With regard to the July 11 release and the August 18 letter, there is no further specification of the charges and the Court can only speculate that the Government is questioning the treatment of the accounting concept of dilution. The Court finds, however, that such treatment was correct and that all relevant financial information was disclosed. The Government also claims that the

May 15, 1972 letter to shareholders was misleading in that it characterized the foreign operations of ECO as contributing two-thirds of ECO's pre-tax operating earnings without disclosing the restrictions enveloping those earnings imposed by the Union Bank settlement agreement. The Court finds, however, that those "restrictions" are collateral to the issue of earnings and that the omission does not in any way cause the statement to be misleading.

Finally, the Court would note that any charge by the Government that the foregoing releases and letters were misleading in their treatment of the European recapitalization or the SWN project are rejected for the reasons expressed in the Court's discussion of the § 10(b) counts. There is one additional matter which should be discussed prior to turning to the §§ 12 and 13 counts.

■ The Government's major legal arguments with respect to the materially misleading nature of the press releases or letters to shareholders disseminated by ECO, and with respect to reports required to be filed by ECO pursuant to the Exchange Act, rely to a large extent upon SEC v. Koenig, 469 F.2d 198 (2d Cir. 1972). In that case, the Court of Appeals affirmed a finding by the trial court that failure to include certain information relative to the recapitalization in the quarterly and annual reports for 1971 violated § 13(a) and Rules 13a–1 and 13a–3 and that failure to include certain information in the August 3, 1971 press release (regarding the Union Bank and Teachers loans) and in the October 5, 1971 SWN project letter to shareholders violated § 10(b) and Rule 10b–5. The Court is well aware that these charges are repeated in the instant indictment. However, it is vital to remember that *those findings were made in a civil proceeding on a motion for preliminary relief on the basis of an affidavit by an SEC staff attorney without the benefit of any evidentiary hearing.* These factual findings are not binding in this case. This Court must make its own findings based upon the

evidence before it and not on the basis of an affidavit submitted to another court in a separate civil proceeding. It is apparent to this Court that both courts in SEC v. Koenig did not have the benefit of all the evidence adduced in the instant case.

### 2. *The Alleged §§ 12 and 13 Violations*

Counts 4 through 16 charge all four defendants with violations of 15 U.S.C. §§ 78*l* and 78m in connection with some 13 reports—*i. e.*, forms 10–Q, 10–K, 8–K and amendments thereto covering the year 1971 and the first half of 1972— filed with the AMEX and the SEC, which reports allegedly contained false and misleading statements of, and omitted to state, material facts concerning the business operations and financial conditions of ECO and its subsidiaries.

█ With respect to these counts the Government must prove that a defendant willfully and *knowingly* filed reports which are required to be filed under the Exchange Act which reports were false and misleading either by affirmative misrepresentation of, or failure to disclose, *material* facts. *See, e. g.*, United States v. Colasurdo, 453 F.2d 585 (2d Cir. 1971), cert. denied, 406 U.S. 917, 92 S.Ct. 1766, 32 L.Ed.2d 116 (1972); United States v. Simon, *supra*, 425 F.2d 796.

To the extent it is charged that the reports fail to properly disclose the European recapitalization, what has been said with respect to the § 10(b) charges is equally applicable here, and will not be repeated.

Although these filings covered the period commencing January 1, 1971, the continuing dispute with H&S delayed any filings for 1971 until mid-September of that year. The evidence indicates that although there was no committee specifically charged with the preparation of the various reports, as was the case with the Publicity Committee, the preparation of the reports was clearly a group effort by ECO's financial staff, Koenig, and outside counsel (principally Reeves). Prior to their resignation as counsel in mid-September, both Sibal and Treadway had reviewed the 10–Qs for the first two quarters of 1971, although Treadway had taken the position that no filings should be made because of the dispute with H&S. Reeves and Chotiner, upon assuming the role of outside counsel, took the position that if ECO met its deadlines for the various filings, the SEC would have no legal basis to continue the suspension of trading of the company's stock. Accordingly, after September 17, 1971 each subsequent filing was essentially made on time, with the exception of the 1971 10–K which new independent auditors were involved.

█ The 10–Qs and 8–Ks, after being drafted, were sent to the outside SEC counsel in Washington, D. C. (Chotiner and Reeves) together with a signature page, were then reviewed by Reeves, who had authority to make any necessary changes, and then filed by him. There is no evidence of any substance connecting Krantz with any filings. The only evidence adduced against Mulligan is that, as Chairman of the Audit Committee which selected the auditors to replace H&S, he reviewed the financial statements and footnotes in the first amended 10–K for 1971. The note to which the Government objects, relating to the European recapitalization, is not false in any way and fully comports with Mulligan's knowledge of the events.

█ In the light of Koenig's and Reeves' activities in connection with the reports filed, it is necessary to deal briefly [9] with certain of the charges of misrepresentation and omission other than those relating to the European recapitalization.

9. The Court would note that detail in the discussion of the filing counts is unnecessary since virtually all of the alleged misrepresentations have been dealt with *supra*, either in the summary of facts or the analysis of the § 10(b) counts.

(a) *The financial condition of ECO and the status of its loans*—The Government asserts that the October 8–K, September 10–Q and November 8–K failed to disclose that ECO's financial condition had deteriorated and that additional creditors had demanded payment and given notices of default. The Court finds that the reports in question more than adequately apprised the public and the SEC of the precarious financial condition of the company.

(b) *The description of the Union Bank and Teachers lawsuits and ECO's defense*—The Government asserts that the statement in footnote 11 of the September 8–Q " 'that the Company does not agree Union Bank had the right to call this loan' is misleading since the Company's position is without basis" (Bill of Particulars, ¶ 14V(d)). However, it is clear to the Court that there was a strong and valid basis for ECO's position. The Government further claims that the October 8–K, the September 10–Q and the November 8–K were misleading in failing to characterize the lawsuits filed by Union Bank and Teachers against ECO as "simply creditors collection suits". It is the Court's finding that although the reports disclosed that the suits were for an outstanding debt, there was no requirement or factual basis for describing them as "simple".

(c) *The basis for the continued SEC suspension*—The Government charges the October 8–K to be false and misleading in stating that the SEC had "no basis" for its continued suspension of ECO's stock from trading without disclosing the SEC's stated basis. There is, however, no evidence in the record as to such stated basis after ECO had filed the 1970 10–K and was engaged in filing the other periodic reports.

(d) *The treatment of debt in litigation*—The Government charges that the September 10–Q, the October 8–K and the November 8–K were false and misleading by reason of the treatment of debt in litigation. As the Court indicated *supra*, the matter of debt in litigation

was a subject of concern in October 1971—whether it should be treated as a short-term, long-term or contingent liability. Reeves advised ECO that in view of the meritorious defenses which the company had and the likelihood that no settlement would be reached within one year that it would be proper to classify this debt in litigation, approximately $23 million, separately. However, no attempt was made to conceal or disguise the amount of debt in litigation. As a result, ECO's working capital for the period was reported as a positive $5.6 million, excluding the $23 million debt in litigation. At the same time all of the defaults in ECO's debt were revealed. The same treatment was employed in the 8–Ks for October and November 1971. The figures were in all respects accurate and complete, the treatment was apparent for all who could read, and there is no evidence to support a charge of misrepresentation.

Various other charges of omission or misrepresentation are made, some of which echo similar charges made with respect to news releases or letters to stockholders and deal with immaterial matters, .*e. g.*, failure to disclose "the circumstances behind the changes in ECO's Board of Directors"; or to disclose that the Union Bank settlement involved an escrow of securities of the European subsidiaries (a matter of no material significance). Other charges have no factual basis, or were contained in other reports and not repeated.

Accordingly, the Court concludes that a reasonable mind could not conclude beyond a reasonable doubt that the defendants were guilty under Counts 4 through 16.

### C. *The Mail Fraud Charges*

The mail fraud charges are premised on the mailing of various reports to the AMEX (Counts 18 and 19) and on the mailing of two letters to stockholders of ECO (Counts 20, 23, 26 and 29). The remaining Counts 21, 22, 24, 25, 27 and 28, covering similar mailings to stockholders, were dismissed during the trial

by the Court as redundant. The mailings to the AMEX consisted of the March and June 10–Qs for 1971, and the 8–K for September 1971 which were mailed on September 17 and October 13, 1971, respectively. The letters to the stockholders consisted of the SWN letter of September 27, 1971 and the letter concerning third quarter results of 1971 dated November 16, 1971 and mailed on September 30 and November 30, 1971, respectively.

■ In order to convict a defendant under these counts the Government must prove:

(a) the defendant knowingly made false representations, or made misrepresentations with reckless indifference to the truth of the representations; *and*

(b) that some actual injury, however slight, was a reasonably probable result of the deceitful representations if they were successful; *and*

(c) that the mails were used in furtherance of the scheme to defraud.

■ It should be noted that a conscious specific intent to defraud is required. It is not sufficient for the Government merely to establish that misrepresentations were made. United States v. Regent Office Supply Co., 421 F.2d 1174, 1182 (2d Cir. 1970). Although the addressee does not have to be the intended victim of the fraud—*e. g.*, the AMEX, if the mailings were in furtherance of a scheme to defraud persons other than the addressee, *e. g.*, persons who would be likely to examine and rely on reports filed with the AMEX—the mailings must be in furtherance of a scheme to defraud.

■ One of the fatal defects in the Government's case is that a reasonable mind could not find beyond a reasonable doubt that there was deception, *i. e.*, either misrepresentation or omission of facts known to the defendants, in the material that was mailed. Since the Court has already held that there was no such deception in the mailed matter,[10] it is impossible to conclude, in the instant case, that there was an intent to defraud.

The second issue, that of intended or reasonably foreseeable harm, presents further serious question. The cases upon which the Government relies involved instances where shareholders or creditors actually suffered, or would have suffered, because of a diminution in the assets of the corporation. *See, e. g.*, United States v. Mackay, *supra*, 491 F.2d at 619–620. It is the Government's contention that the mailings in the instant case were in furtherance of a scheme to defraud encompassed by the previous portions of the conspiracy count, *i. e.*, that the defendants attempted to maintain the incumbent management of ECO in office by violating the securities laws. Let us consider briefly those whom the Government asserts were defrauded.

■ First, and most obvious, are the shareholders. With regard to the European recapitalization, the Court cannot find any intended harm since the transaction did not change ECO's ultimate control or ownership of the foreign subsidiaries. Therefore, even a knowing omission of the details of the transaction cannot be part of a scheme to defraud because the defendants could not have intended harm to the stockholders —indeed, the evidence clearly supports the conclusion that the purpose of the transaction was to *protect* the shareholders of ECO, and the Government's analogy to cases in which a defendant was looting the corporation is inapposite. Nor does the November 16, 1971 letter to stockholders appear to be part of a scheme to defraud in characterizing ECO's working capital as "positive" and in treating "debt in litigation" as long term. The Court has already held that

---

10. The issue of misrepresentation or omission with respect to all of the mailed matter has been discussed *supra* in connection with either the conspiracy, § 10(b) or §§ 12 and 13 counts.

such a treatment was legitimate. Finally, the SWN letter of September 27, 1971, which has been discussed more fully *supra*, would not appear to have been part of a scheme to defraud. The Court has already found that the letter was not misleading and that the Government had not proved that the defendants knew facts contrary to those asserted in the letter. Furthermore, if the scheme was one to maintain present management in power, it is curious that no mention was made in the letter that the award of the contract was contingent upon the continuance of present management.

■■ The second category of potential victims of a fraud are the creditors. With regard to the recapitalization, there was no showing that the transaction could or did adversely affect their ability to reach the Italian subsidiaries in the event of a suit to collect outstanding loans. Indeed, the securities of the foreign subsidiaries were fully utilized in ECO's settlement with Union Bank after the recapitalization. They had not been placed out of reach of ECO's creditors. While it seems clear that a purpose of the recapitalization was to protect ECO's shareholders from precipitate action by its creditors, there has been no showing that any legal right of those creditors was infringed or that the recapitalization was illegal. As for the SWN letter, Union Bank was not impressed with the project when it was mentioned at the creditors' meeting on June 29, 1971 and it is unlikely that the situation had changed over the succeeding three months. No reasonable mind could conclude that these reports or letters were mailed in furtherance of a scheme to defraud creditors.

■ Next we must consider the investing community, not the shareholders but potential investors. Such consideration must, of necessity, be brief, for there was no trading in ECO stock when these letters were mailed and no investing community. Certainly the Government cannot argue that these people could be the victims of a scheme to maintain Koenig in office—since they

did not yet own any stock they could not have any effect upon Koenig's incumbency. Furthermore, the indictment does not charge a conspiracy to induce purchases of ECO stock.

■ Finally, we come to the AMEX and the SEC. One of the theories, only now asserted, is that the material mailed to those agencies was there for all to read. The simple answer is that if persons could not be defrauded by direct mailings, they certainly could not be defrauded by reading the same material at the AMEX or the SEC. The other theory is that both the AMEX and the SEC were defrauded directly, *i. e.*, that the defendants were trying to have ECO's trading suspension lifted. It is true that Reeves, and possibly Chotiner, insisted that the periodic reports be filed when due even though prior SEC counsel had recommended no filings until the dispute with ECO's auditors was resolved. It is further true that Reeves believed that only when the filings were made when due would the suspension of trading be lifted. But filing promptly is quite different from false filing. The management of ECO was well aware that during this entire period its every action was being watched, second-guessed and immediately reported on to dissident shareholders, major creditors, the AMEX and the SEC. That the defendants, under all the existing circumstances, would have knowingly disseminated false or misleading information reasonably calculated to harm is incredible. Furthermore, the Court has already held that the reports filed were not materially misleading.

Accordingly, the Court finds that a reasonable mind could not find beyond a reasonable doubt that the defendants were guilty of the crimes charged in Counts 18, 19, 20, 23, 26 and 29.

D. *The Conspiracy Count* (continued)

■ And so we return to the conspiracy count. One looks in vain through over 5,000 pages of testimony, and hundreds of exhibits (many volumi-

nous) for a scintilla of direct testimony or documentary evidence attesting, or even supporting a fair inference, that these defendants got together and agreed to violate federal law for the purpose of maintaining Koenig as chief executive officer of ECO or for any other purpose. There is no question that, for the most part, Krantz and Mulligan supported Koenig against Davidson—but so did others who are not defendants or named as co-conspirators. However, as has been noted, Krantz resigned when Koenig would not accept Krantz' suggestion that Koenig resign. Each act of the defendants testified to is at least as susceptible of inference that it was performed in good faith and for a legitimate business or professional purpose as that it was done in bad faith and for an unlawful purpose. This is not a case of concerted action to do anything except, perhaps, to promote ECO's survival and there is no evidence of agreement to use criminal means to achieve that end. Indeed, for the most part, the evidence shows *disconcerted* reaction by management to the catastrophic events which came close to destroying ECO. The more one considers this case, the clearer it becomes that it is not a "securities" case, but one involving an attempt, ultimately successful, to unseat the chief executive officer of ECO. This is not a case where the defendants sought or received anything from ECO except their ordinary salaries, employee benefits, director's and professional fees and reimbursement for out-of-pocket expenses. It is not a case where stockholders have been defrauded in connection with any stock purchase solicitation, and no such offense is charged. If any stockholder suffered loss, that loss arose from actions occurring prior to the time covered by this indictment or unrelated to the acts or omissions of these defendants.

During the year preceding the alleged inception of the conspiracy ECO common stock had fallen from approximate-ly $26 per share to less than $15 per share. In May 1971, after the consent decree, the price was in the $11–$13 range, culminating in a price of $10.50 on May 20, the day before trading was halted. Thereafter, except for a brief period in August 1971 when the price ranged from $3–$4 in over-the-counter trading, there has been no public market since the stock has been suspended from trading. Therefore, whatever effect the releases, letters, and reports issued by the defendants may have had, they did not inflate the value of ECO's stock.

One can say that Koenig's activities in 1969, concurred in by Davidson, led to the events of 1971—such activities, however, are not the subject of the present indictment. Those public relations activities led to the AMEX, and later the SEC, investigations in 1970 and 1971. Those investigations, in turn, precipitated the rift between Koenig and Davidson, led to the position taken by H&S with respect to the 1970 financial statements, and the consent decree. These events resulted in the suspension of trading in ECO's stock, caused continued delay in filing the 1970 financials, and set in motion an avalanche of creditors' claims. As a result of this discouraging turn of events, of which the European creditors were aware, the recapitalization took place, fostered by a desire to preserve the most valuable corporate assets from precipitate creditor action. It is against this background that the actions of these defendants must be judged. A conspiracy is not proved by disavowal of criminal acts or disagreement with the conclusions of a governmental agency. Nor is it proved by preliminary drafts of documents, never disseminated, or documents approved by independent authority. Nor is it proved by hindsight. Finally, it is not proved in the absence of criminal intent.

Since the Court has determined that under all the circumstances of this case a reasonable mind could not fairly conclude guilt beyond a reasonable doubt with respect to each substantive count [11]

---

11. The Court has not, as yet, addressed itself to the charge that an object of the con-

spiracy was to violate the consent decree. Clearly, the defendants complied with the

and as to each defendant, and, more particularly, could not find that each defendant possessed criminal intent with regard to each substantive count, the conspiracy count must likewise fail.

Accordingly, a judgment of acquittal will be entered as to each defendant on all counts of the indictment and bail as to each of the defendants is exonerated.

So ordered.

This is a habeas corpus action brought pursuant to 28 U.S.C. §§ 2241, 2242. Petitioner is an inmate at the requirement that the 1969 10-K be refiled and that a publicity committee screen all press releases and other information disseminated. With regard to the alleged contravention of the prohibition against violating § 10(b), it will suffice to say that the discussion of the § 10(b) substantive counts disposes of that charge.